2002 WY 94

Frank GOGLIO, Cora Goglio, Kent Harker, Fred Cobb, Richard Asay, Dorothy Asay, Alfred Boschetto, Robert Barngrover, Jean Barngrover, Robert Carmine, Warren Webb, Gerald Kittleson, and Roy Holloway, Appellants (Plaintiffs),

v.

STAR VALLEY RANCH ASSOCIATION, a Wyoming mutual benefit, non-profit corporation, Appellee (Defendant).

Frank Goglio, Cora Goglio, Kent Harker, Fred Cobb, Richard Asay, Dorothy Asay, Alfred Boschetto, Robert Barngrover, Jean Barngrover, Robert Carmine, Warren Webb, Gerald Kittleson, and Roy Holloway, Appellants (Plaintiffs),

v.

Star Valley Ranch Association, a Wyoming mutual benefit, non-profit corporation, Appellee (Defendant).

Nos. 00–256, 00–257.

Supreme Court of Wyoming.

June 21, 2002.

Robert J. Logan of Law Offices of Robert J. Logan, San Jose, CA, Representing Appellants. Argument by Mr. Logan.

Sean P. Durrant of Palmerlee & Durrant LLC, Buffalo, WY, Representing Appellee. Argument by Mr. Durrant.

Before LEHMAN, C.J., and GOLDEN, HILL, KITE, and VOIGT, JJ.

LEHMAN, Chief Justice.

[¶ 1] Appellant homeowners Goglio et al. (homeowners) are residential lot owners in Star Valley Ranch, a recreational subdivision in Lincoln County, and members of the Star Valley Ranch Association. The consolidated appeal they present to this court is comprised of two cases. In case number 00–256, appellant homeowners sought a declaratory judgment that the culinary water use fee imposed upon them by appellee Star Valley Ranch Association (Association), a non-profit corporation, was a violation of the recorded Declaration of Covenants, Conditions and Restrictions (DCCRs) that govern the relationship between these parties. The district court granted summary judgment for the Association determining that the DCCRs, articles of incorporation, by-laws, and applicable Wyoming statutes authorize the imposition of the fee in question. Having herein determined that the governing documents do not authorize the imposition of such a fee absent an affirmative vote by two-thirds of the members of the Association, we reverse the judgment of the district court.

[¶ 2] In case no. 00–257, appellant homeowners seek reversal of the district court's order purportedly granting W.R.C.P. 11 sanctions to appellants. While we agree that the district court's order is unusual, we construe it essentially as a denial of requested sanctions and, as such, not an abuse of discretion and thus affirm.

[¶ 3] Affirmed in part, reversed in part, and remanded.

## ISSUES

[¶ 4] Case number 00–256 presents the following issues for review:

1. Whether Star Valley Ranch Association, a Wyoming mutual benefit non-profit corporation (the "Association") should have been barred by res judicata or collateral estoppel from levying the culinary water use fee.

2. Whether Appellee corporation had the authority to impose a culinary water use fee upon those Appellant lot owners whose homes were hooked into and using the corporation's water system.

Case number 00–257 presents these issues:

1. Whether the district court abused its discretion in issuing the W.R.C.P. 11 sanction order.

2. Whether Appellant Logan's due process rights were violated when sanctions were ordered against him.

## FACTS AND PROCEDURAL HISTORY

[¶ 5] In the early 1970s, the developer Leisure Valley began selling lots in Star Valley Ranch, a rural recreational subdivision in Lincoln County. Star Valley Ranch consists of 2,050 residential lots plus amenities such as swimming pools, golf courses, tennis courts, hiking trails, a bar, and a restaurant. The DCCRs were adopted to make the lots more attractive to potential buyers and to maintain property values. Leisure Valley organized the Association as a nonprofit corporation for the benefit of the lot owners to enforce the DCCRs and to own, manage, and maintain the common area, which consists of the property acquired by the Association for the common use and enjoyment of the mem-

bers. All lot owners in Star Valley Ranch are automatically members of the Association.

[¶ 6] On October 4, 1995, the district court in the third judicial district issued an order resolving a case captioned *Goglio et al. v. Star Valley Ranch Ass'n,* case number 9367 (*Goglio I*). *Goglio I* involved the imposition of a "homeowner's fee" by the Association on some of its members. The court determined that the imposition of the "homeowner's fee" by the Association was unenforceable as beyond the authority granted to it by the recorded DCCRs. The court reached its conclusion by finding that the fee at issue was an assessment in excess of the maximum annual assessment allowed under the DCCRs and that the Association had not obtained the requisite membership approval before the imposition of the fee. The Association did not appeal the district court's order in *Goglio I.*

[¶ 7] On June 28, 1997, the Association held a special election seeking membership approval for a special assessment to fund, among other things, the acquisition of water lines and the replacement of water lines pursuant to an agreement with the developer, Leisure Valley.[1] The membership did not approve the special assessment. On November 14, 1998, the Association held a second special election seeking membership approval for a special assessment, the purpose of which included funds for the acquisition of water lines and the replacement of water lines. Again, the membership did not approve the special assessment.

[¶ 8] Thereafter, on April 29, 1999, the Association Board adopted Resolution No. 2 which levied a $180 annual fee on all property owners who used the culinary water system.[2] The Resolution was sent to homeowners with an attached cover letter dated May 3, 1999. The letter read that the board had been studying the issue for some time and "[u]pon completion of this thorough study, which included favorable opinions from two different law firms, the use fees were enacted and are effective immediately." The letter further read that funds collected "will be used to help provide and maintain these services." The Resolution provided that homeowners who did not pay the culinary water fee would be disconnected from the system.

[¶ 9] Subsequently, some of the appellant homeowners sent letters to the Association Board of Directors seeking information regarding the culinary water use fee. Generally, they requested information on the Board's authority for imposition of the fee, asked how this fee differed from the fee found unenforceable in *Goglio I,* asked for more specificity regarding the purpose and use of the fee, and requested information regarding the legal opinions referred to in the Board's letter of May 3, 1999. According to their affidavits and attachments, many of the homeowners never received a response from the Board, others received responses which declined to discuss the legal opinions given to the Board or to further answer the homeowners' queries.

[¶ 10] On June 30, 1999, the homeowners filed a petition for declaratory judgment seeking a determination by the district court that the imposition of the culinary water use fee was beyond the authority granted to the Association Board under the DCCRs or barred under the doctrine of res judicata pursuant to the holding of *Goglio I.* On August 24, 1999, the Association moved to dismiss the petition alleging that *Goglio I* was wrongly decided because it relied in part on a repealed statute. It is the allegations in this motion that gave rise to the district court's sanction order of July 19, 2000, and form the grounds for case number 00–257 in this consolidated appeal.

[¶ 11] On September 21, 1999, appellants moved for summary judgment. On June 22,

---

1. Portions of this agreement were the subject of previous litigation ultimately decided by this court in *Arychuk v. Star Valley Ass'n,* 997 P.2d 472 (Wyo.2000). The *Arychuk* decision was pending throughout the course of the proceedings in the instant case and was issued by this court on February 28, 2000.

2. The resolution also imposed a $30 annual fee on those members who wished to use the Association garbage depot system. This fee is not herein at issue.

2000, after supplemental briefing by the parties, the district court treated appellee's motion to dismiss as a converted motion for summary judgment pursuant to W.R.C.P. 12(c) and granted summary judgment to the Association and denied summary judgment to the homeowners. The court decided that the culinary water use fee was different from the fee at issue in *Goglio I* and thus not barred by the doctrine of res judicata. It also concluded that the DCCRs, articles of incorporation, and Wyoming statutes authorized the Association Board to impose the culinary water use fee. This timely appeal followed.

### STANDARD OF REVIEW

 [¶ 12] When this court reviews a grant of summary judgment entered in response to a petition for declaratory judgment, we invoke our usual standard for review of summary judgments. *Fontaine v. Board of County Comm'rs,* 4 P.3d 890, 892 (Wyo.2000); *Board of County Comm'rs v. Geringer,* 941 P.2d 742, 745 (Wyo.1997); *Kunard v. Enron Oil & Gas Co.,* 869 P.2d 132, 134 (Wyo.1994). The summary judgment can be sustained only when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. W.R.C.P. 56(c); *Fontaine,* 4 P.3d at 892; *Kirby v. NMC/Continue Care,* 993 P.2d 951, 952 (Wyo.1999); *Selby v. Conquistador Apartments, Ltd.,* 990 P.2d 491, 494 (Wyo. 1999); *Roberts v. Klinkosh,* 986 P.2d 153, 155 (Wyo.1999). In this instance, there is no contention that any genuine issue of material fact exists, and our concern is strictly with the application of the law. The interpretation and construction of contracts is a matter of law for the courts. *Reed v. Miles Land and Livestock Co.,* 2001 WY 16, ¶ 10, 18 P.3d 1161, ¶ 10 (Wyo.2001); *Mathis v. Wendling,* 962 P.2d 160, 163–64 (Wyo.1998). We review a grant of summary judgment deciding a question of law *de novo* and afford no deference to the district court's ruling. *Hirschfield v. Board of County Comm'rs,* 944 P.2d 1139, 1141 (Wyo.1997).

### DISCUSSION
**Case number 00–256**

 [¶ 13] The district court determined that the Board's actions were not barred by the doctrines of res judicata or collateral estoppel premised upon its earlier holding in *Goglio I.* The district court reasoned that the culinary water use fee at issue in the instant case is a "use" fee and was thus different from the homeowner's "service" fee litigated in *Goglio I.* Accordingly, it declined to apply the principles of res judicata to the current controversy. However, we think that the district court's decision letter from *Goglio I* more accurately describes the holding and the scope of the issues at controversy in the earlier case:

### UNDERLYING ISSUE

The controversy concerning the homeowners fee is a controversy concerning the power and authority of the Homeowners Association; and the controversy proposes a central question: Can the Association establish, collect or otherwise enforce a fee or charge against a member of the association without the member's express or implied consent and agreement?

The answer is obvious: No, the Association cannot collect or otherwise enforce a fee or charge against a member of the association, unless the member, expressly or impliedly, consents and agrees to the charge.

[¶ 14] Appellants correctly point out that the Association Board relies on no new authority beyond that argued or capable of being argued in the earlier litigation for its current contention that it has the authority to impose the culinary water use fee. We thoroughly articulated our jurisprudence on the subject of res judicata in *CLS v. CLJ,* 693 P.2d 774, 775–76 (Wyo.1985):

The doctrine of res judicata is that a judgment, decided upon the merits by a court with jurisdiction, is conclusive of that cause of action and facts or issues litigated, both to the parties and their privies in any other action in the same or different court of concurrent jurisdiction on the same issues. 46 Am.Jur.2d Judgments § 394.

"Res judicata is the term applied to the rule that a final judgment rendered by a

court of competent jurisdiction on the merits is conclusive as to the rights of the parties and their privies; and, as to them, it constitutes an absolute bar to a subsequent action involving the same claim, demand, or cause of action." *Barrett v. Town of Guernsey*, Wyo., 652 P.2d 395, 398 (1982).

Res judicata is a rule of universal law which pervades every well-regulated system of jurisprudence. *Rubeling v. Rubeling*, Wyo., 406 P.2d 283 (1965). A final, valid determination on the merits of a case is conclusive on the parties and those matters adjudicated. *Roush v. Roush*, Wyo., 589 P.2d 841 (1979).

In cases involving identical parties, capacity of parties, cause of actions, and subject matter, a decision in the first case bars relief in the second case. *United Nuclear Corp. v. General Atomic Co.*, 98 N.M. 633, 651 P.2d 1277 (1982). The criteria involved in res judicata are: (1) identity in parties; (2) identity in subject matter; (3) the issues are the same and relate to the subject matter; (4) the capacities of the persons are identical in reference to both the subject matter and the issues between them. *Fox v. 7L Bar Ranch Co.*, Mont., 198 Mont. 201, 645 P.2d 929 (1982). See, *Kumberg v. Kumberg*, 232 Kan. 692, 659 P.2d 823 (1983). A policy reason for res judicata is that each litigant shall be limited to one opportunity to try his case on the merits. *Santos v. State, Dept. of Transp., Kauai Division*, 64 Haw. 648, 646 P.2d 962 (1982).

"The principle of res judicata fosters reliance on judicial action, and tends to eliminate vexation and expense to the parties, wasted use of judicial machinery and the possibility of inconsistent results." Developments in the Law, Res Judicata, 65 Harvard L.Rev. 820 (1952). See also, *Delgue v. Curutchet*, Wyo., 677 P.2d 208 (1984).

We think the district court's reasoning was erroneous because it decided the issue of res judicata simply by determining that the home service fee at issue in *Goglio I* and the culinary water use fee in the instant case were "obviously different." It reached its result by concluding that the original fee was a charge to provide security, trash removal, dust control, snow removal, road and ***water service maintenance,*** while the culinary water use fee is a charge for use of the water system owned by the corporation. However, we think this foregoing analysis puts undue focus on the charges themselves, their labels, and their purported uses, rather than more fittingly focusing on the subject of the previous litigation and the scope of the district court's holding in *Goglio I* as compared to the subject and the issues which comprise the current litigation.

■ [¶ 15] At its core, *Goglio I* decided the power and authority of the Association to collect and enforce assessments and fees upon its members. The decision was grounded upon a judicial construction of the parties' contract, i.e. the DCCRs and other governing documents, as well as applicable statutes. This construction of the parties' contract was not appealed. Accordingly, it should be given res judicata effect in the instant controversy. "An adjudication as to the construction or validity of an instrument is res judicata when there is an issue in another action between the same parties, although the immediate subject matter of the two actions is different." 46 Am.Jur.2d *Judgments* § 552 (1994). Moreover, water maintenance fees were explicitly at issue in the previous case and again are the subject matter currently on appeal. We see no legal distinction between a "homeowner's service fee" which includes a charge for water maintenance and a "culinary water use fee" to be used for the maintenance of the water system, sufficient to override the application of res judicata in the instant case.

■ [¶ 16] In addition, we disagree with the Association's argument that *Goglio I* was wrongly decided and, more importantly, reject its contention that error in the first judgment would necessarily preclude our application of res judicata to the current case. This court has long held that "[r]es judicata is not, as a general rule, defeated by error in the initial judgment." *See Price v. Bonnifield*, 2 Wyo. 80, 86 (1879); *Cermak v. Great*

*West Cas. Co.*, 2 P.3d 1047, 1054 (Wyo.2000).[3] Nevertheless, because the parties before us continue to be bound to one another by a contractual relationship, in an attempt to forestall further litigation, we will herein address on the merits their arguments regarding the imposition of assessments and fees and render a dispositive construction of the applicable controlling documents and statutes.

[¶ 17] The central issue before us is the scope of power and authority granted to the Association to levy assessments and fees from the members of Star Valley Ranch and the source(s) of that authority. Stated alternatively, to what imposition of assessments and fees have the members given their express consent. The parties essentially disagree with regard to the construction and interaction of pertinent language found in the DCCRs, Association by-laws, articles of incorporation, and the Wyoming Non–Profit Corporation Act codified in Wyoming Statutes §§ 17–19–101 *et seq.* We think the following commentary accurately articulates the general functions and interdependence of the various documents:

> Homeowners associations serve three primary functions: levying and collecting assessments; managing and maintaining common property for the benefit of residents; and enforcing covenants that govern developments. They derive authority to carry out these functions from several documents, including the declaration of covenants, conditions, and restrictions (CC & Rs), the association's bylaws and articles of incorporation, and the deeds to the property within a development.
>
> The CC&Rs for the subdivision are of primary importance in the establishment of a homeowners association. The declaration generally establishes the covenants by which all owners within the development agree to be bound and the respective obligations of the owners and the association. Developers record the declaration in the land records before any lots are sold. The covenants within the declaration run with the land and bind subsequent property owners. The covenants are reciprocally enforceable agreements among homeowners that regulate anything from the architectural design and use of structures to the number of pets or guests allowed. "Neighborhood uniformity is preserved" by enforcing the covenants.
>
> Another legal document essential to an association is its bylaws, which establish procedures for the internal government and operation of the association. The bylaws are not always recorded, but may be incorporated by reference in the declaration. Whereas declarations have been likened to an association's constitution, bylaws can be seen as the statutes that detail the day-to-day operations of the association.[4]
>
> After they are formed, but before the title transfer of the common property to the homeowners association, an association usually incorporates. "Incorporation not only provides greater certainty to the association as the fee title holder but also brings to bear the entire body of statutory and case law developed in the jurisdiction's corporate law." In conjunction with the declaration and bylaws, the articles of incorporation establish the general boundaries of the association, including the governing structure, financing, assessment mechanisms, voting and control procedures, and the specification of ownership.

Casey J. Little, *Riss v. Angel: Washington Remodels the Framework for Interpretng Restrictive Covenants*, 73 Wash. L.Rev. 433, 437–38 (1998). *See also* Wayne S. Hyatt, *Condominiums and Home Owner Associa-*

---

**3.** Appellees contend that the *Goglio I* district court relied upon a repealed statute in reaching its decision that the Association did not have the authority to impose a homeowner's service fee on its members. Wyo. Stat. Ann. § 17–6–103, repealed effective January 1, 1993, and replaced by Wyo. Stat. Ann. § 17–19–302. We disagree with the proposition that these statutes were the "fundamental underpinning of the Summary Judgment" in *Goglio I*. Rather, the court's construction of the DCCRs, bylaws, and articles of incorporation was the fundamental underpinning of the earlier case.

**4.** This court has once before addressed application of the Association's by-laws in *Skane v. Star Valley Ranch Ass'n*, 826 P.2d 266 (Wyo.1992).

*tions: A Guide to the Development Process* (McGraw–Hill, Inc.1985).

[¶ 18] In accordance with the foregoing discussion, we continue to hold that the DCCRs generally determine the power and authority granted to the Star Valley Association by its members. As we said in *Arychuk et al. v. Star Valley Ass'n* when construing the applicable documents:

Covenants such as the Declaration are contractual in nature, and they are to be interpreted, and we believe enforced, according to principles of contract law. *McLain v. Anderson,* 933 P.2d 468, 474 (Wyo.1997); *Anderson v. Bommer,* 926 P.2d 959, 961 (Wyo.1996); *McHuron v. Grand Teton Lodge Co.,* 899 P.2d 38, 40 (Wyo.1995). As we said in *Sinclair Oil Corp. v. Columbia Cas. Co.,* 682 P.2d 975, 979 (Wyo.1984):

We will not invalidate a contract entered into freely by competent parties on the basis of public policy unless that policy is well settled, unambiguous and not in conflict with another public policy equally or more compelling.

In most circumstances, the Arychuk group could expect that their contractual rights under the Declaration would be honored and enforced.

*Arychuk,* 997 P.2d at 479.

[¶ 19] In *Arychuk,* it is clear that this court deliberately decided the issue before it on a very narrow basis through reference to Wyo. Stat. Ann. § 17–19–302(a)(i). The case involved a settlement between the Developer and the Association over the conveyance of the culinary water system. We determined

---

5. The Association relies on Wyo. Stat. Ann. § 17–19–302(a)(xiv) (LexisNexis 2001) (emphasis added) which provides:

(a) **Unless its articles of incorporation provide otherwise,** every corporation has perpetual duration and succession in its corporate name and has the same powers as an individual to do all things necessary or convenient to carry out its affairs including, without limitation, power:

. . .

(xiv) To impose dues, assessments, admission and transfer fees upon its members[.]
We think this statute must be read in pari materia with statute § 17–19–613:
**Member's liability for dues, assessments and fees.**

---

that, in that limited instance, any conflict between the general powers authorized to the Association under the Act and the DCCRs would be resolved in favor of the strong public policy which favors settlement of litigation. *Id.* at 479. Appellee again requests that we find within the Wyoming Non-Profit Corporation Act a general grant of authority to the Association explicitly limited by the DCCRs. However, we find no public policy basis for overriding the parties' express agreement and instead will look to the DCCRs, by-laws, and articles of incorporation to determine the parties' rights and obligations with regard to the imposition of assessments and fees.

[¶ 20] In doing so, we conclude that there is no real conflict among the various documents.[5] Much of the language relied upon by the Association, similar to § 17–19–302(a)(xiv) of the Act, grants general powers of assessment to the Association. However, when addressing more specifically the manner in which those assessments must be made and the maximum dollar value of the assessments, the following language found within the DCCRs is duplicated in the Association's by-laws, and the by-laws are in turn referenced in the applicable article of incorporation addressing assessments.

[¶ 21] The pertinent article is set out below:

## ARTICLE VI

### COVENANTS FOR MAINTENANCE ASSESSMENTS

*Section 1. Creation of the Lien and Personal Obligation of Assessments.*

A member may become liable to the corporation for dues, assessments or fees as a condition for remaining a member. An article, by-law or corporate resolution authorizing dues, assessments or fees is not, by itself, sufficient to impose liability without the consent or acquiescence of the member.
We believe in the context of a homeowners association it is clear that the general powers of the non-profit corporation may be limited, not only by the articles of incorporation, as recognized in the statute itself, but, because of the specialized character of the entity, also by the DCCRs and bylaws which comprise the core agreement between the homeowners association and its members.

*Each Owner or purchaser of any Lot or parcel shall be deemed to covenant and agree to pay to the Association (1) annual assessments or charges, and (2) special assessments for capital improvements, such assessments to be fixed, established, and collected from time to time as herein-after provided.* The annual and special assessments, together with such interest thereon and costs of collection thereof as hereinafter provided, shall be a charge on the land and shall be a continuing lien upon the property against which such assessment is made when the Association causes to be recorded with the County Recorder of the County of Lincoln a notice of assessment stating the amount of such assessment and such other charges as hereinbelow provided ...

*Section 2. Purpose of Assessments.* The assessments levied by the Association shall be used exclusively for the purpose of promoting the recreation, health, safety, and welfare of the Members of the Association, and *in particular for the improvement and maintenance of the services and facilities devoted to this purpose and related to the use and enjoyment of the Common Area.*

*Section 3. Basis and Maximum of Annual Assessments.* Until January 1, 1987, the maximum annual assessment shall be Two Hundred Fifty Dollars ($250) per Lot or parcel.

(a) Thereafter, the maximum annual assessment may be increased effective January 1 of each year by the Board of Directors, without a vote of the membership, in conformance with the percentage increase, if any, of the Consumer Price Index, United States City Average for All Urban Consumers, as published by the United States Department of Labor for the immediately preceding month of July over such Index for the previous immediately preceding month of July.

(b) Anything contained herein to the contrary notwithstanding, *the maximum annual assessment may be increased for the next succeeding year* above that established by the Consumer Price Index formula by a vote of the members taken within the last quarter of each such year, for each succeeding year, provided that any such change shall have the assent of two-thirds (2/3) of the votes of the Members, present in person or by proxy, at a meeting duly called for this purpose, written notice of which shall be sent to all Members not less than thirty (30) days, nor more than sixty (60) days, in advance of the meeting, setting forth the purpose of the meeting.

(c) After consideration of current maintenance costs and future needs of the Association, the Board of Directors shall fix the annual assessment at an amount not in excess of the maximum established for the subject year.

*Section 4. Special Assessments for Capital Improvements.* In addition to the annual assessments authorized above, the Association may levy, in any assessment year, a special assessment applicable to that year only *for the purpose of defraying, in whole or in part, the costs of any construction or reconstruction, unexpected repair or replacement of a described capital improvement upon the Common Area, including the necessary fixtures and personal property related thereto;* provided that any such assessment shall have the assent of two-thirds (2/3) of the votes of the Members present in person or by proxy at a meeting duly called for this purpose, written notice of which shall be sent to all Members not less than thirty (30) days nor more than sixty (60) days in advance of the meeting, setting forth the purpose of the meeting.

. . .

*Section 6. Uniform Rate of Assessment.* Both annual and special assessments must be fixed at a uniform rate for all Lots or parcels and may be collected on a monthly or other convenient basis.

[¶ 22] "Common Area" is defined in Article I of the DCCRs as "all real property acquired by the Association for the common use and enjoyment of the Members of the Association, including any structures or other

improvements thereon, and any real property used for ingress or egress to the Property which has been dedicated to, but is not being maintained by, the County of Lincoln." The Developer conveyed the culinary water system to the Association, and appellee admitted in its answer that it is indeed "Common Area." Thus, there is no dispute upon that point.

[¶ 23] In our analysis of the DCCRs, we will apply the following established rules of construction:

> Because they are contractual in nature, restrictive covenants are to be interpreted in accordance with the principles of contract law. *Anderson v. Bommer,* 926 P.2d 959 (Wyo.1996). We construe plain terms of a covenant, if they are sufficiently clear, without reference to any attendant· facts and circumstances or extrinsic evidence. *American Holidays, Inc. v. Foxtail Owners Ass'n,* 821 P.2d 577, 579 (Wyo.1991); *Klutznick v. Thulin,* 814 P.2d 1267, 1270 (Wyo.1991); *Knadler v. Adams,* 661 P.2d 1052, 1053 (Wyo.1983).

*McLain v. Anderson,* 933 P.2d 468, 474 (Wyo.1997).

[¶ 24] Our review of the DCCRs indicates that they are unambiguous as a matter of law. Further, we think a fair reading of the plain language of the instrument demonstrates an assessment procedure whereby the members have expressly covenanted to pay a fixed annual assessment for the maintenance of the "Common Area" which shall be a lien upon the property. Additionally, the members have covenanted to pay an annual assessment above the fixed formula upon approval by ⅔ of the membership. Lastly, the members have expressly consented to the levy of a "Special Assessment for Capital Improvements" again upon an affirmative vote of ⅔ of the members.

[¶ 25] The affidavit of Roger D. Cox, Chairman of the Board of Directors of the Association, indicated that the culinary water use fee was enacted in order to repair and maintain the current water system as well as expand the system in order to provide sufficient water to all members of the Star Valley Ranch. Judging by this description of the purposes underlying the enactment of the

culinary water use fee, one can only conclude that it is an assessment and most aptly labeled as a "Special Assessment for Capital Improvement." Nor would it be unreasonable to find, based upon its earlier conduct of seeking membership approval for the imposition of such a fee, that the Board had originally drawn this same conclusion. Implicit in the DCCR language that requires approval of ⅔ of the members of the Association for the imposition of a special assessment is the proposition that a special assessment cannot be levied without the requisite approval.

[¶ 26] The district court reached its conclusion that the appellant homeowners had expressly consented to the culinary water service fee by first interpreting the language of Section 1: "Each Owner or purchaser of any Lot or parcel shall be deemed to ·covenant and agree to pay to the Association (1) *annual assessments or charges, and* (2) special assessments for capital improvements" as *"annual assessments and charges* and (2) ..." and then by finding that the water service fee was a charge that, by applying the foregoing· interpretation, was expressly consented to by the members. In making its interpretation, the district court relied upon three Wyoming cases, including *Smith v. City of Casper,* 419 P.2d 704, 706 (Wyo.1966) in which this court said, "in the multitudinous cases which have discussed interpretation of the word 'or' as 'and' and vice versa, it seems to be the general rule that the interchange can be made only when it is necessary to harmonize the provisions of a statute, give effect to all its provisions, save it from unconstitutionality, or to effectuate the obvious intent of the legislature." The district court applied this rule of interpretation to the ·DCCRs concluding it was necessary to harmonize the provisions of the covenants, as well as to effectuate their intent. We disagree. Generally speaking, when the terms of a contract are .unambiguous, our search for the intent of the parties is confined to the language contained within the "four corners" of an integrated contract. Our standard of interpretation for contracts declares that the words used to memorialize the intent of the parties are given the plain meaning that a reasonable person, in the

position of the parties, would understand them to mean. *Doctors' Co. v. Insurance Corp. of America,* 864 P.2d 1018, 1023 (Wyo. 1993); *Wangler v. Federer,* 714 P.2d 1209, 1213 (Wyo.1986).

[¶ 27] Again, upon reviewing the DCCRs as a whole, we can but only conclude that "or" means "or." When viewed in context it appears the terms "assessments or charges" are simply used interchangeably as synonyms; moreover, this drafting technique is continued throughout the document. The DCCRs unambiguously set forth a system of assessments to maintain the Common Area which include only two types of levy (1) annual assessments or charges, and (2) special assessments for capital improvements. Though sympathetic to the Association Board's desire to effectuate its purpose to maintain the Common Area for the welfare and benefit of its members, courts may not rewrite contracts under the guise of interpretation. *Amoco Production Co. v. E.M. Nominee Partnership Co.,* 2 P.3d 534, 540 (Wyo. 2000). This court would be remiss if we allowed the district court's interpretation to stand in the face of the clear language of the parties' written agreement.

[¶ 28] Nor can we approve the district court's reasoning as applied to the instant case that:

> The most significant difference between annual assessments and other charges imposed by the Association is choice. Each member of the Association has a right to choose whether or not to exercise their easement of enjoyment by using the water system owned by the Association. If their choice is to use the water system, they will be charged a culinary water use fee. If their choice is not to use the system, no fee will be charged. The annual assessment is entirely different. The membership has

no choice. The annual assessment is mandatory[.]

The above analysis disregards Article V of the DCCRs entitled *"Property Rights"* which provides in Section 1 that "Every Owner shall have a right and easement of enjoyment in and to the Common Area and such easement shall be appurtenant to the respective Lot or parcel for which each owner holds such interest and shall pass with the title to every assessed Lot or parcel, subject to the following provisions...."[6] According to this language, the members have a property right in and to the Common Area, such as the culinary water system, subject in subsection (d) to the right of the Association to suspend the member's right to use of the common facilities for any period during which any *assessment* against his Lot or parcel remains due and unpaid.

[¶ 29] While the district court's analysis may be appropriate to true optional services provided by the Association, such as the garbage disposal fee also established by Resolution No. 2, it is not applicable to use of the Common Area. The owners' property rights in the Common Area, the system of assessments the very purpose of which is to maintain the Common Area, and the applicable assessment imposition and enforcement mechanisms, are all established and governed by controlling language found throughout the DCCRs primarily within Articles V and VI. There is simply no further "choice" available to either party on these subjects; rather they are bound by the choice made to enter into their express written contract.

[¶ 30] Lastly, the Association contends that the homeowners expressly acquiesced to the imposition of a water use fee by their acknowledgments and signatures on various HUD property reports issued pursuant to the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1700 *et seq.*[7] Appellee

---

**6.** Article V Section 1(b) outlines the right of the Association to charge reasonable admission and "other fees for the use of any *recreational facility situated upon* the Common Area." Judging by this language and the DCCRs as a whole this subsection is not applicable to the culinary water use fee.

**7.** We note with some exasperation that appellee expends at least six pages of its appellate brief

discussing and arguing the language and effect of the aforementioned HUD property reports; it specifically directs this court in its brief to the record volume containing such reports, yet inexplicably fails to designate that volume of the record to this court for review. Nor did we independently find those reports located elsewhere in the voluminous designated record. Certainly, we could have acquired the applicable

alleges that each of these reports contained a "Water" section which explained the Star Valley Ranch culinary water system and the charges that would be imposed upon hookup. Apparently, some of the appellants' HUD reports contained the language, "the annual cost for use of water is estimated at $15; this charge will be determined by the property owners' association," while the other appellants' HUD reports stated, "the use fees will be determined by the property owner's association." We assume the HUD property reports, as represented by appellee, do not affect our foregoing analysis of the parties' contract because the HUD reports were not incorporated by reference in any of the controlling contractual documents. The Fifth Circuit has efficiently articulated the Act thusly:

The underlying purpose of the Interstate Land Sales Full Disclosure Act (the Act) is to insure that a buyer, prior to purchasing certain kinds of real estate, is informed of facts which will enable him to make an informed decision about purchasing the property. *Paquin v. Four Seasons of Tennessee, Inc.*, 519 F.2d 1105, 1109 (5th Cir.1975). To accomplish this purpose the Act imposes certain requirements on developers who use any means or instruments of interstate commerce to sell or lease lots in a "subdivision." In particular, 15 U.S.C.A. § 1703(a)(1) makes it unlawful for such a developer "to sell or lease any lot in any subdivision unless ... a printed property report ... is furnished to the purchaser in advance of the signing of any contract or agreement for sale or lease by the purchaser." If the requirements of § 1703(a)(1) are not met, § 1703(b) gives the purchaser a right of rescission. Section 1709(b)(1) gives the purchaser the right to sue a developer who violates § 1703(a) and § 1719 gives the United States district courts jurisdiction over such suits. An action brought under § 1709(b)(1) to enforce the right created by § 1703(b) must be brought within two years after the violation occurs. 15 U.S.C.A. § 1711; *McCaffrey v. Diversified Land Co.*, 564 F.2d 1241 (9th Cir.1977); *Jacobsen v. Woodmoor Corp.*, 400 F.Supp. 1 (W.D.Mo.1975).

*Law v. Royal Palm Beach ·Colony, Inc.*, 578 F.2d 98, 99–100 (5th Cir.1978) (footnotes omitted).

■■■ [¶ 31] We think it is clear that the homeowners signed the HUD reports as acknowledgement of their receipt to evidence the Developer's compliance with the requirements of the Act. Furthermore, our research discloses few cases in which HUD property reports have been· analyzed apart from the requirements of the Act and in the context of the parties' contractual relationship.[8] The courts in cases which integrated the HUD reports into the parties' contract specifically found that the contract on its face made explicit reference to the HUD reports. *See Correa v. Pecos Valley Development Corp.*, 126 Ariz. 601, 617 P.2d 767 (App.1980); *Marriott v. Harris*, 235 Va. 199, 368 S.E.2d 225 (1988); *High Knob Associates v. Douglas*, 249 Va. 478, 457 S.E.2d 349 (1995). No one in the instant case has alleged such facts, nor do we find any reference to the HUD reports in either the DCCRs or by-laws. The DCCRs, by-laws, and articles of incorporation comprise the parties' integrated agreement.[9] Moreover, viewing the HUD reports in light of the provisions of the subsequent written contract, rather than unequivocally supporting appellee's view that the homeowners were on notice of the Association's intent to charge a water use fee and acquiesced to such a charge, one in the homeowners' position could reasonably have concluded that the system of assessments outlined in the DCCRs and the Association's by-laws incorporated the charge. In any event, we find the HUD property reports are extrinsic to the parties' subsequent express

---

volume, but conclude that the HUD reports themselves are not indispensable to our resolution of the issue.

**8.** This court found a financial statement appended to a HUD property report to be a memorandum of the parties' oral agreement to pay a sales commission sufficient to satisfy the statute of frauds in *Richardson v. Schaub*, 796 P.2d 1304, 1310 (Wyo.1990) (Urbigkit, C.J. dissenting).

**9.** We do not intend to imply by this holding that developers may not be bound by the representations they make in HUD property reports.

integrated contract and consequently reject the appellee's argument. "Under the parol evidence rule, neither oral testimony nor prior written agreements are admissible to explain or vary the terms of a fully integrated written contract." *Resource Technology Corp. v. Fisher Scientific Co.*, 924 P.2d 972, 976 (Wyo.1996) (applying *Gemini Equipment Co. v. Pennsy Supply, Inc.*, 407 Pa.Super. 404, 595 A.2d 1211, 1215 (1991)).

[¶ 32] Ultimately, we conclude that the district court erred in its interpretation of the parties' contract including the specific applicable provisions of the DCCRs. We find that the culinary water use fee has been levied to maintain the "Common Area" of the Star Valley Ranch, *i.e.* the culinary water use system; as such it is an assessment in excess of the maximum allowable under the applicable covenants. Consequently, we hold that the Association cannot impose the culinary water use fee unless ⅔ of its members approve such an action. We therefore reverse the case, vacate the district court's entry of summary judgment for appellee Association, order summary judgment be entered in favor of appellant homeowners Goglio *et al.*, and authorize any other proceedings not inconsistent with this opinion.

### Case No. 00–257

[¶ 33] In this case, appellant homeowners claim the district court erred by 1) failing to impose a harsher sanction upon the Association's attorney, David Palmerlee, and 2) imposing a sanction upon their own attorney, Robert Logan, when no motion for sanctions had been made against him, nor had the court on its own motion entered an order to show cause. The issues in the case arise from allegations made in the Association's motion to dismiss. The motion alleged judicial error in *Goglio I* premised upon attorney misconduct, *i.e.* preparing the order for summary judgment with the knowledge that the district court's decision was based upon a repealed statute and failing to disclose the repealed statute to the court. *See* fn. 3. Our review of the record indicates that Mr. Lo-

gan complied with the requirements of W.R.C.P. 11(c)(1)(A) by requesting that Mr. Palmerlee withdraw the Motion to Dismiss prior to seeking the judicial sanction.

[¶ 34] After correspondence between the attorneys and advance service of the proposed Rule 11 Motion on Mr. Palmerlee (thus satisfying the "safe harbor" provision of the Rule) on September 22, 1999, Mr. Logan filed the motion requesting sanctions. It alleged that Mr. Palmerlee violated Rule 11 by misrepresenting to the court that he had conducted a reasonable inquiry into the allegations of judicial error and professional misconduct prior to signing the Motion to Dismiss; that the contentions in the Motion did not have evidentiary or legal support; and that the Motion was presented for the purposes of harassment and increasing the cost of litigation. The Homeowners' Rule 11 Motion asked for the attorney's fees generated to bring the motion and necessary to deter repetition of such conduct. The hearing on the sanctions motion was reset, then vacated, and ultimately was not held.

[¶ 35] On July 19, 2000, the district court entered an order captioned "Order for Sanctions." It read:

> In this case Counsel for Defendant accused Counsel for Plaintiff of "acting improperly" in previous litigation between the parties, i.e., in the so-called Goglio I litigation. Counsel for Plaintiff seeks sanctions against opposing Counsel.

Therefore, the following sanctions are entered:

1. Counsel for Defendant shall apologize to Counsel for Plaintiff for accusing him of improper and unethical conduct.

2. In the future, if either Counsel accuses the other of improper conduct without having an unimpeachable factual foundation for the accusation, the accuser shall be cited for contempt.[10]

In a letter dated August 3, 2000, Mr. Palmerlee sent the following "apology" to Mr. Logan, "Dear Bob: Incident to the Court's Order of July 12, 2000, [sic] please accept my sincere apologies for whatever allegations you found to be offensive and unfounded.

---

**10.** Though the issue has not been raised, it is questionable whether this order complies with W.R.C.P. 11(c)(3).

Yours truly, David F. Palmerlee."[11] It is from the court's order that the Homeowners appeal.

▮ [¶ 36] Initially, we note that only the homeowners, Goglio *et al.*, have filed a notice of appeal with this court. We recently addressed our jurisdiction to hear an appeal from the imposition of sanctions when only the client, and not also the sanctioned attorney, has appealed in *Welch v. Hat Six Homes*, 2002 WY 81, 47 P.3d 199 (Wyo.2002). Within that opinion, we announced the rule that, when the award of sanctions is against the attorney, clients do not possess the requisite interest, pecuniary or otherwise, to support standing. *Welch*, ¶ 12 (citing *Estate of Bishop v. Bechtel Power Corp.*, 905 F.2d 1272, 1276 (9th Cir.1990)). In those circumstances, it is the attorney's interest that is at stake, and it is the attorney who should bring the appeal in his own name. *Welch*, ¶ 13. When the attorney fails to file a notice of appeal in his name, W.R.A.P. 2.07 and 1.03 have not been satisfied, and this court lacks jurisdiction to hear and decide the issue.

[¶ 37] However, in *Welch*, we also specifically recognized the narrow exception to the foregoing rule that applies when it is objectively clear from the court's order that it *only* applies to the attorney and not the client. We stated that designation of such an order provides sufficient evidence, by implication, of the attorney's intention to take an appeal from the order of sanctions. *Welch*, ¶ 14 (quoting *Laurino v. Tate*, 220 F.3d 1213, 1218 (10th Cir.2000)). Judging by the notice of appeal in this action, it is unclear that Mr. Logan intended to take an appeal from the order of sanctions as it applied to him. It is captioned only in the clients' names, and much of the argument in the appellants' brief addresses the injury to the clients from the district court's denial of the requested sanctions. Therefore, it seems apparent that he is not a party to this appeal. His clients do not have standing to appeal the imposition of sanctions as they apply to him. Especially

so when, in doing so, they assert a violation of their attorney's due process rights. Thus, the appellants' second issue "whether *Appellant* Logan's due process rights were violated" by the imposition of sanctions against him is not before this court, and we have no jurisdiction to decide such an issue.[12]

▮ [¶ 38] However, the clients certainly have standing and are proper parties to appeal the district court's grant of sanctions against opposing counsel which did not include the relief requested, including a grant of attorney's fees generated defending the Motion to Dismiss which they allege was sanctionable under W.R.C.P. 11. We apply an abuse of discretion standard in reviewing an award of sanctions. *Bender v. Phillips*, 8 P.3d 1074, 1077 (Wyo.2000); *Rodgers v. Rodgers*, 627 P.2d 1381, 1383 (Wyo.1981). A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did. An abuse of discretion has been said to mean an error of law committed by the court under the circumstances. *Rodgers* at 1383.

▮ [¶ 39] Appellants contend, in regard to the district court's order, that Mr. Palmerlee apologized to Mr. Logan and that: "The apology for accusing counsel of 'acting improperly' does not address the misrepresentations to the court or the filing of frivolous claims resulting in delay and increased cost of litigation. The sanctions should have addressed the conduct that gave rise to the abuse of process and increased costs, not to make Logan feel better. Logan was not the party harmed by the delay and expense of defending the frivolous allegations." While we find some merit in the clients' argument, nonetheless Rule 11(c)(2) specifically provides:

> A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or compa-

---

11. Presumably, Mr. Logan found the allegation that he had committed professional misconduct by deliberately and consciously misleading the court to be offensive and unfounded.

12. To the extent that paragraph 2 of the district court's order is a "sanction" upon Mr. Logan, rather than merely a warning or the court's attempt to control conduct within its courtroom, it is clear that under W.R.C.P. 11(c)(1)(B) sanctions cannot be imposed upon the court's own motion without a prior "order to show cause" served upon the attorney.

rable conduct by others similarly situated. Subject to the limitations in subparagraphs (A) and (B), *the sanction may consist of, or include, directives of a nonmonetary nature ...."*

Additionally, this court has specifically encouraged district courts to consider the imposition of nonmonetary sanctions in *Caldwell v. Cummings,* 2001 WY 106, ¶ 14, 33 P.3d 1138, ¶ 14 (Wyo.2001). We cannot say that the district court abused its discretion in awarding a nonmonetary sanction, *i.e.* the admonition that attorney Palmerlee apologize to attorney Logan. However, it should also be needless for this court to remind all members of the Bench and Bar that accusations of professional misconduct are not to be lightly made nor lightly taken.

### CONCLUSION

[¶ 40] Finding the controlling covenants and other documents to be unambiguous in requiring ⅔ membership approval before the imposition of the culinary water use fee in question, we reverse and remand case no. 00–256. Having determined that the district court did not abuse its discretion in imposing a nonmonetary sanction upon counsel, we affirm case no. 00–257.

[¶ 41] Affirmed in part, reversed and remanded in part with instructions.