2010 WY 51

Cynthia FAYARD and Galeforce, LLC, a Wyoming Limited Liability Company, Appellants (Plaintiffs),

v.

The DESIGN COMMITTEE OF the HOMESTEAD SUBDIVISION, 2nd and 3rd Filings, a Wyoming Unincorporated Association; Sandra Day; Horton Spitzer; and Gary Finkel, each as an individual and as a member of the Design Committee of the Homestead Subdivision, 2nd and 3rd Filings, Appellees (Defendants).

No. S–09–0145.

Supreme Court of Wyoming.

April 23, 2010.

Representing Appellants: Paula A. Fleck and Susan L. Combs of Holland & Hart LLP, Jackson, Wyoming. Argument by Ms. Fleck.

Representing Appellees: James K. Lubing of Law Office of James K. Lubing, Jackson, Wyoming; Douglas F. Schultz of Schultz Law Firm, LLC, Jackson, Wyoming. Argument by Mr. Lubing.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

KITE, Justice.

[¶ 1] Cynthia Fayard and Galeforce, LLC [1] (collectively "Fayard") own lots in the Homestead Subdivision in Teton County. Fayard filed a declaratory judgment and in-

---

1. Ms. Fayard is the managing member of Gale- force, LLC.

junctive action against the Design Committee of the Homestead Subdivision, 2nd and 3rd Filings, and committee members Sandra Day, Horton Spitzer and Gary Finkel (collectively "the Design Committee"), alleging the Design Committee had improperly approved a special assessment to pave the common roads. The district court ruled that the Design Committee had acted within its authority under the subdivision covenants and granted summary judgment in favor of the Design Committee. We affirm.

## ISSUES

[¶ 2] Fayard presents a general issue on appeal:

A. Did the District Court err when it granted [the Design Committee's] motion for summary judgment?

The Design Committee's statement of the issues is more detailed:

A. Were the findings of the District Court clearly erroneous or contrary to the great weight of the evidence because the Covenants were so ambiguous on their face that they presented a double meaning which an objective person could not understand?

B. Did [Fayard] present evidence to the District Court that [the Design Committee] acted without reasonable care in protecting the wildlife and aesthetics of the subdivision?

C. [Is Fayard] equitably barred from seeking relief by the doctrine of laches because [her] inaction to stop the paving was inexcusably delayed?

## FACTS

[¶ 3] Fayard owns two lots in the Homestead Subdivision, Second Filing, and one lot in Homestead Subdivision, Third Filing, in Teton County (Homestead II/III). Homestead II/III is governed by a Declaration of Covenants, Conditions and Restrictions (CCRs). Homestead II/III is part of a larger development known as the John Dodge development, which includes the John Dodge Homestead subdivisions, the Beehive subdivision, and the Homestead subdivisions. The development shares a common road system.

[¶ 4] In 2005, several portions of the John Dodge development decided to pave their roads. The Design Committee was asked if Homestead II/III wanted to participate in the paving project. The Design Committee polled the homeowners and determined that they were not in favor of paving at that time.

[¶ 5] In January 2006, the Design Committee met at Ms. Fayard's home. The minutes of the meeting stated: "All agreed to review the issue of paving the roads in the spring after we've had a chance to see how the previously paved roads have held up through the winter. No further action at this time." Ms. Fayard's term on the Design Committee expired in January 2006.

[¶ 6] In May 2006, the Design Committee learned that the remaining portions of the John Dodge development were going to pave their roads over the summer. Consequently, the committee sent ballots to the lot owners in Homestead II/III to gather votes on using a special assessment to pave the roads in their portion of the development, as well. They also sent ballots to lot owners in the Beehive subdivision. Although the Beehive lot owners did not have an official right to vote on the matter, the Design Committee considered the Beehive vote as advisory. Of the nine lot owners of Homestead II/III, six returned ballots in favor of the paving. The remaining three votes belonged to Fayard; those ballots were never returned, although Ms. Fayard verbally objected to the project. The Beehive subdivision lot owners all voted in favor of the paving and helped pay for it.

[¶ 7] Relying on the vote, the Design Committee issued a resolution on June 14, 2006, approving a special assessment for the paving project. The first phase of the paving was completed that summer and the remainder of the project was completed in the summer of 2007. The Design Committee invoiced the lot owners for the paving costs. Although initially Fayard did not pay the assessment, she eventually tendered payment under protest.

[¶ 8] On August 23, 2007, Fayard filed a complaint for declaratory judgment and injunctive relief, challenging the Design Committee's authority to approve a special as-

sessment for paving the roads in Homestead II/III. Fayard sought to have the paving removed and the road returned to its original gravel state. The Design Committee filed a motion for summary judgment, arguing that it was entitled to a judgment as a matter of law because it had clear authority under the CCRs to present the special assessment for paving the roads to the lot owners for a vote and Fayard was barred from bringing her claim by the equitable doctrine of laches.[2] After holding a hearing, the district court granted summary judgment in favor of the Design Committee ruling that the Design Committee acted within its authority under the CCRs when it presented the special assessment question to the lot owners. Fayard appealed.

## STANDARD OF REVIEW

[¶ 9] Our standard of review on a summary judgment order is *de novo*. *Wyoming Med. Center v. Wyoming Ins. Guar. Ass'n*, 2010 WY 21, ¶ 11, 225 P.3d 1061, 1064 (Wyo.2010).

> [W]e have exactly the same duty as the district judge; and, if there is a complete record before us, we have exactly the same material as did [the district judge]. We must follow the same standards. The propriety of granting a motion for summary judgment depends upon the correctness of a court's dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law. This court looks at the record from the viewpoint most favorable to the party opposing the motion, giving to him all favorable inferences to be drawn from the facts contained in affidavits, depositions and other proper material appearing in the record.

*McGarvey v. Key Prop. Mgmt.*, 2009 WY 84, ¶ 10, 211 P.3d 503, 506 (Wyo.2009) (citation omitted). *See also, Cheek v. Jackson Wax Museum, Inc.*, 2009 WY 151, ¶ 12, 220 P.3d 1288, 1290 (Wyo.2009).

In reviewing summary judgment orders involving contracts, the interpretation of the contractual language is a matter of law for the court when the language is clear and unambiguous. *Cheek*, ¶ 12, 220 P.3d at 1290; *Vargas Ltd. Partnership v. Four "H" Ranches Architectural Control Comm.*, 2009 WY 26, ¶ 11, 202 P.3d 1045, 1050 (Wyo.2009). If the language is not clear or there are other material issues of fact, summary judgment is not appropriate.

## DISCUSSION

Resolution of this case requires interpretation of the CCRs. The pertinent provisions state:

> 1. *Purpose.* Declarants are the owners of certain real property located in Teton County, Wyoming, which property is more particularly described in Exhibit A attached hereto and made a part hereof, and which is hereinafter referred to as the "property." The property contains significant wildlife habitat and is of high scenic and natural value, and Declarants are adopting the following covenants, conditions and restrictions to preserve and maintain the natural character and value of the property, as well as the views and privacy, of all owners of the property or any part thereof.
>
> . . . .
>
> 5. *Development and Land Use Restrictions.* All development and use shall conform to the following requirements:
>
> . . . .
>
> q. Common Road. The common road on the property shall be a private road at all times, and each lot owner shall be responsible for an equal portion of the maintenance costs for said road.
>
> r. *Shared Access Road.* The Shared Access Road providing access to the property shall be a private road, and each lot owner shall be responsible for a proportionate share of the snow removal and maintenance costs for the shared access road. Snow removal and maintenance costs on the shared access road shall be

---

**2.** The Design Committee later amended its motion for summary judgment. We have considered both filings in this case and will not distinguish between the original motion and the amended motion.

divided with owners of other property to which access is provided by said road.

. . . .

t. *Wildlife Protection.* It is recognized by the Declarant and the purchasers or owners of each and every lot within the property, that many wildlife species live on or migrate through the property during various times of year. The following limitations on use and development are intended, in addition to all the other requirements of the covenants, to protect, preserve and maintain the existing wildlife habitat on the property and to minimize the adverse effects of development on wildlife habitat[.]

6. *Design Committee.* The Design Committee shall consist of three (3) members . . . .

a. *Authority and Duties.* The Design Committee shall be responsible for the enforcement and administration of the requirements of these covenants and shall issue building permits, contract for and supervise common services, enforce the development and use regulations and take all other actions necessary to administer and enforce these covenants.

. . . .

c. *Common Services.* The Design Committee shall contract for snow removal and periodic maintenance services on the Common Road and Shared Access Road. The Design Committee shall prepare an annual budget estimate and submit annual statements to each lot owner based upon the estimate. [Billing procedures omitted].

d. *Special Assessments.* On the approval of two-thirds (2/3) of the lot owners, the Design Committee shall have the authority to establish special assessments to meet emergency or unusual conditions that have arisen with regard to the access facilities or utilities which service the property. Special assessment shall be allocated in accordance with the formula set forth for common services, and shall be payable within thirty (30) days of the billing date.

[¶ 12] Restrictive covenants are contractual in nature and are interpreted in accordance with principles of contract law.

*Omohundro v. Sullivan,* 2009 WY 38, ¶ 9, 202 P.3d 1077, 1081 (Wyo.2009); *Goglio v. Star Valley Ranch Ass'n,* 2002 WY 94, ¶ 18, 48 P.3d 1072, 1079 (Wyo.2002). The court's goal is to determine and effectuate the intention of the parties, especially the grantor or declarant. *Stevens v. Elk Run Homeowners' Ass'n, Inc.,* 2004 WY 63, ¶ 13, 90 P.3d 1162, 1166 (Wyo.2004). Our analysis starts with a determination of whether the contractual language is clear or ambiguous. *Asherman v. Asherman,* 2009 WY 141, ¶ 8, 221 P.3d 302, 304 (Wyo.2009). We give the words their plain and ordinary meaning, *Omohundro,* ¶ 9, 202 P.3d at 1081, and consider the whole document, rather than just one clause or paragraph. *Stevens,* ¶ 13, 90 P.3d at 1166. "An ambiguous contract 'is an agreement which is obscure in its meaning, because of indefiniteness of expression, or because a double meaning is present.' " *Brockway v. Brockway,* 921 P.2d 1104, 1106 (Wyo.1996), quoting *Amoco Prod. Co. v. Stauffer Chem. Co.,* 612 P.2d 463, 465 (Wyo.1980). If the contractual language is clear, the court interprets it as a matter of law and summary judgment is appropriate. If contract language is ambiguous, a question of fact is presented and summary judgment typically is not warranted. *See, Wadi Petroleum, Inc. v. Ultra Resources, Inc.,* 2003 WY 41, ¶ 10, 65 P.3d 703, 707 (Wyo.2003); *Amoco Prod. Co. v. EM Nominee Partnership Co.,* 2 P.3d 534, 539–40 (Wyo.2000).

[¶ 13] The Design Committee claims summary judgment was appropriate because the CCRs' language is clear and there are no genuine issues of material fact. The committee argues that it acted within its authority under paragraph 6(d) of the CCRs to present the special assessment question to the lot owners because the unpaved roads presented an "unusual condition[ ] that [had] arisen with regard to the access facilities or utilities which service the property." Fayard counters that summary judgment was inappropriate because the term "unusual" is broad and there are genuine issues of material fact as to whether an "unusual condition" existed to justify paving the roads in this case.

[¶ 14] In accordance with our rules of contract interpretation, we start with the

plain language of the CCRs. If the contract provision is clear, interpretation is an issue of law for the court. *Wadi Petroleum,* ¶ 10, 65 P.3d at 707; *Amoco Prod. Co.,* 2 P.3d at 539–40. Paragraph 6 gives the Design Committee comprehensive and exclusive authority regarding subdivision roads. Paragraph 6(c) authorizes the Design Committee to contract for snow removal and periodic maintenance services and bill the lot owners for such services without specific approval from them. Paragraph 6(d) allows the Design Committee to address "unusual" or emergency conditions by submitting a special assessment vote to the lot owners. The term "unusual" is not defined in the CCRs. We, therefore, give the term its plain and ordinary meaning—"being out of the ordinary; deviating from the normal." *Webster's Third New Int'l Dictionary* 2514 (2002).

[¶ 15] Reading Paragraph 6(d) in context and in accordance with its plain meaning, an unusual condition would be one that does not fall within the Design Committee's authority to address routine or ordinary matters without lot owner approval under paragraph 6(c). The use of the broad term "unusual" reflects an intention that the Design Committee be vested with wide discretion to determine whether to present a special assessment to the lot owners to address the condition. The lot owners have the final say on whether the condition justifies imposition of a special assessment.

[¶ 16] The fact that the covenants do not provide any limitations on what could be considered "unusual" indicates the declarant intended that the special assessment process apply to a wide variety of circumstances. The meaning of the term is not obscure or otherwise unclear. Thus, contrary to Fayard's assertion, the declarant's use of the comprehensive contractual term "unusual condition" does not mean the contract is ambiguous and cannot be interpreted as a matter of law.

[¶ 17] Given our conclusion that the "unusual condition" phrase is intended to apply to a broad variety of circumstances, we turn to the circumstances presented in this case to determine whether there are genuine issues of material fact in application of the CCRs'

language. The Design Committee maintained that the unpaved condition was unusual because the remainder of the roads in the John Dodge development, which were all connected, had been paved or were slated to be paved during the summer of 2006. They described the roads in Homestead II/III as an "island" of gravel. Fayard argues that the declarant did not intend the gravel roads be considered an unusual condition under the CCRs because the roads were unpaved at the time the covenants were adopted and had remained so for more than twenty-five years.

[¶ 18] Fayard's unequivocal statement that the original gravel roads could never be considered an "unusual condition" is not supported by the CCRs. There is no indication in that document that the declarant intended that "access facilities and utilities" must remain unchanged or that a condition could never be considered "unusual" if it existed at the time the covenants were adopted. If that were the case, the declarant would not have provided the special assessment process and would have specifically stated that the roads were to remain unpaved. In order to accept Fayard's position that the gravel roads could never be considered an unusual condition under the CCRs, we would have to modify the terms of the covenants. "Our rules of contract interpretation prohibit us from amending or modifying a contract under the guise of interpretation." *Brumbaugh v. Mikelson Land Co.,* 2008 WY 66, ¶ 28, 185 P.3d 695, 704 (Wyo.2008).

[¶ 19] Fayard also argues that the CCRs are ambiguous because there are genuine issues of material fact as to whether the declarant intended that conditions outside of Homestead II/III be considered in determining whether there was an "unusual condition" within the subdivision. Whether an "unusual condition" can be created by conditions outside of the subdivision is a question of contract interpretation and, therefore, a question of law. Access facilities and utilities are not stand alone services; they originate and connect with features outside of the property. Nothing in the covenants indicates that the declarant intended that conditions outside the property could not be considered in the special assessment process. We, therefore,

reject Fayard's interpretation of the CCRs and conclude, as a matter of law, that the fact that the roads in Homestead II/III would have been the only roads left unpaved in the John Dodge development was a valid consideration in determining whether an unusual condition had arisen.

[¶ 20] Further, the "island" of gravel rationale was not the only one the Design Committee offered for its conclusion that the unpaved roads created an "unusual condition." The Design Committee presented evidence that the gravel roads had changed over time. Committee member Horton Spitzer testified that the roads had markedly deteriorated over the years, resulting in wash boarding and potholes that increased the danger of traveling on them. He also stated that, due to routine maintenance required for a gravel road, including grading and snowplowing, the width of the roads had increased. In fact, the paved roads were several feet narrower than the gravel roads had been. The snowplowing and grading had also damaged the drainage ditches along the sides of the roads. The sworn statements of Design Committee members Sandy Day and Gary Finkel were not quite as detailed as Mr. Spitzer's but they echoed his general sentiments.

[¶ 21] Fayard offered no evidence to counter the Design Committee's other bases for asserting an "unusual condition" existed. Specifically, she did not contradict the statements that the gravel roads were in poor condition, maintenance had become difficult, and the roads had been widened over the years, resulting in destruction of the drainage ditches. In that regard, she did not meet her obligation to counter the Design Committee's prima facie case. We have explained:

> [t]he party requesting a summary judgment bears the initial burden of establishing a *prima facie* case for summary judgment. If he carries his burden, "the party who is opposing the motion for summary judgment must present specific facts to demonstrate that a genuine issue of material fact exists." *Id.* We have explained the duties of the party opposing a motion for summary judgment as follows:

> After a movant has adequately supported the motion for summary judgment, the opposing party must come forward with competent evidence admissible at trial showing there are genuine issues of material fact. The opposing party must affirmatively set forth material, specific facts in opposition to a motion for summary judgment, and cannot rely only upon allegations and pleadings . . ., and conclusory statements or mere opinions are insufficient to satisfy the opposing party's burden.

*Hatton v. Energy Electric Co.,* 2006 WY 151, ¶ 9, 148 P.3d 8, 12–13 (Wyo.2006), quoting *Cook v. Shoshone First Bank,* 2006 WY 13, ¶ 12, 126 P.3d 886, 890 (Wyo.2006). We conclude, as a matter of law, that the undisputed facts presented by the Design Committee established that the gravel roads fell within the broad meaning of an "unusual condition" to justify a special assessment under the CCRs.

[¶ 22] Fayard also challenges the paving as a violation of other portions of the CCRs. She claims that the CCRs' purpose of maintaining the natural character of the subdivision was not served by paving the roads. She insists that gravel roads are more consistent with that purpose. Obviously, any roads detract from the natural character of real property. However, the Design Committee offered evidence that the paved roads were actually narrower than the gravel roads, which presumably allowed the excess roadway to be reclaimed to its natural state. The Design Committee also stated that the look of the paved roads "fit in very nicely with the rustic nature of the area." Fayard does not present any evidence to contradict the statements that the paved roads did not look much different than the gravel roads. Consequently, she did not establish a genuine issue of material fact in that regard.

[¶ 23] Fayard inferentially challenges the procedure used by the Design Committee in submitting the special assessment to the lot owners for approval. Fayard states that the "unusual condition" was an after-the-fact justification for the paving and points to the fact that there is no record of a formal finding that an unusual condition ex-

isted. She does not, however, direct us to any CCR provision which requires a formal finding before the matter can be submitted to the lot owners. The Design Committee's resolution dated June 14, 2006, which announced the ballot results and imposed the special assessment, indicated it was acting under the authority of the special assessment provision in paragraph 6(d).

 [¶ 24] Fayard further claims that the Design Committee did not adequately consider the impact of paving on wildlife, as required by the CCRs. Although the purposes of the CCRs included preservation and maintenance of wildlife habitat, there is no provision requiring formal consideration of the impact on wildlife habitat before a special assessment may be presented to the lot owners. In addition, when the evidence on this issue is examined, we are not convinced there is a genuine issue of material fact as to the impact of the paving on wildlife. Design Committee members testified that they had considered wildlife when deciding to present the matter to the lot owners. They also stated that they could think of no reason that wildlife would be adversely impacted and, in fact, by narrowing the roadway, more area was available for wildlife habitat. Ms. Fayard made the following statement about the effects of paving on wildlife habitat:

> [Asphalt] is ... it's a petroleum product. There are a lot of studies on whether [asphalt] impacts habitat or whatever. But I think common sense would tell you that when you lay 10 miles worth of asphalt on animal habitat you've affected it and impacted it.

Fayard did not, however, present any of the "studies" she referred to and her statement does not account for the fact that roads already existed before they were paved. Her conclusory statement does not raise a genuine issue of material fact about the impact on wildlife from the paving of the roads.

[¶ 25] The final argument propounded by Fayard was that the Design Committee acted "unreasonably in how it directed the paving to be performed." In particular, Ms. Fayard takes issue with a curve that was placed in the paved road near her property in an effort to slow traffic and the fact that certain areas in Homestead Circle were not completely paved. We reject Fayard's arguments in this regard because she presented no evidence that the paving was outside or somehow inconsistent with the CCRs or the road easements.

[¶ 26] In sum, the "unusual condition" basis for imposing a special assessment under the CCRs was intentionally broad and the undisputed facts presented here fell within that definition. There are no genuine issues of material fact and the contract was properly interpreted by the district court as a matter of law. The Design Committee acted within its authority under the CCRs in imposing the special assessment for paving the Homestead II/III roads. Because we affirm the district court's summary judgment on the interpretation of the covenants, we do not need to address the laches issue.

[¶ 27] Affirmed.