2006 WY 136

**SEVEN LAKES DEVELOPMENT COMPANY, L.L.C.; and David W. Kuhn, Appellants (Defendants),**

v.

**John MAXSON and Marilyn Maxson, husband and wife, Appellees (Plaintiffs).**

No. 06–6.

Supreme Court of Wyoming.

Oct. 27, 2006.

 

 

 

Representing Appellants: William L. Hiser, Kelly Neville Heck, and Lindsay Hoyt of Brown & Hiser LLC, Laramie, Wyoming. Argument by Mr. Hiser.

Representing Appellees: M. Gregory Weisz and Devon O'Connell Coleman of Pence and MacMillan LLC, Laramie, Wyoming. Argument by Mr. Weisz.

Before VOIGT, C.J., and GOLDEN, HILL *, and BURKE, JJ, and YOUNG, D.J.

VOIGT, Chief Justice.

[¶ 1] Appellants Seven Lakes Development Company, L.L.C. and David Kuhn ("the Appellants") appeal the district court's determination that Appellees John and Marilyn Maxson ("the Maxsons") hold a profit a prendre (profit) to hunt and fish on the Appellants' land and that such profit: (1) has not been abandoned; (2) has not been extinguished through adverse possession; (3) allows the use of motorized vehicles; and (4) allows access to adjacent federal lands. We affirm.

## ISSUES

[¶ 2] 1. Did the district court properly determine on summary judgment that the Maxsons held a profit in the Appellants' land?

2. Did the district court err when it found that the profit had not been abandoned by the Maxsons or their predecessors in interest?

3. Did the district court err when it found that the profit had not been extinguished through adverse possession?

4. Did the district court err when it found that the profit allows the use of motorized vehicles by the Maxsons while exercising their rights under the profit?

* Chief Justice at time of oral argument.

5. Did the district court err in its findings regarding the Maxsons' right to enter adjacent public lands from the Appellants' property while exercising their rights under the profit?

## FACTS

[¶ 3] At the outset, we will generally describe the facts relevant to this appeal, but will discuss other facts relevant to each issue in the discussion of those issues. On April 4, 1955, Clarence McKinley ("McKinley") received a patent granting him title to 480 acres of land in Carbon County, Wyoming. The land is legally described as "N½N½, SW¼ NW¼, N½SW¼, SW¼SW¼" of section 22 and "W½W½" of section 27 in Township 18 North, Range 78 West of the 6th Principal Meridian, Wyoming. McKinley also owned an additional piece of land in section 22 that is now held by Seven Lakes.

[¶ 4] McKinley apparently intended to subdivide the land in sections 22 and 27 and form a small community he called "Woodedge." He created twenty-four 10–acre plots that were to be sold with the intent that the buyers would erect cabins thereon. McKinley intended to build certain improvements on the land he retained, including a road, a toboggan run, and a lodge; however, such improvements were never completed. Two of the parcels that McKinley conveyed in this manner are now owned by the Maxsons. As we will more closely examine in our discussion, *infra*, the deeds from McKinley to the Maxsons' predecessors contained language indicating that the original grantees were also granted a "privilege" to hunt and fish on the lands owned by McKinley. A large portion of the land in the Woodedge area that was subject to the "privilege" is now owned, through various conveyances, by the Appellants. Seven Lakes owns the land at issue in section 22 and David Kuhn owns the land in section 27.

[¶ 5] The instant appeal arose from an action filed by the Maxsons against the Appellants and Clear Creek Cattle Company.[1]

1. Clear Creek Cattle Company is a business that is closely related to Seven Lakes; however, Clear

The Maxsons sought a declaratory judgment on the legal status of their interest in the lands originally retained by McKinley and now owned by the Appellants. On cross-motions for summary judgment, the district court determined that the "privileges" to hunt and fish held by the Maxsons constituted a covenant running with the land, namely, a profit.

[¶ 6] The district court later held a bench trial to determine the scope of the profit and whether the profit had been extinguished in the time between the grant from McKinley in the 1950s and the filing of the present action. After the trial, the district court concluded, among other determinations, that the profit had not been abandoned by the Maxsons' predecessors in interest, had not been adversely possessed by the Kuhn family, allowed motorized vehicles to be used in the enjoyment of the profit by the dominant estate owners, and did not allow a general access easement across the Appellants' lands to adjacent public lands. The district court also determined, however, that the Maxsons could not be prevented from crossing into public lands during their proper use of the profit. The instant appeal followed.

## STANDARD OF REVIEW

 [¶ 7] Our standard of review for summary judgments is well known:

Summary judgment is appropriate when no genuine issue as to any material fact exists and the prevailing party is entitled to have a judgment as a matter of law. *Eklund v. PRI Environmental, Inc.*, 2001 WY 55, ¶ 10, 25 P.3d 511, ¶ 10 (Wyo. 2001); *see also* W.R.C.P. 56(c). A genuine issue of material fact exists when a disputed fact, if it were proven, would have the effect of establishing or refuting an essential element of the cause of action or defense that has been asserted by the parties. *Williams Gas Processing–Wamsutter Co. v. Union Pacific Resources Co.*, 2001 WY 57, ¶ 11, 25 P.3d 1064, ¶ 11 (Wyo.2001). We examine the record from the vantage point most favorable to the

party who opposed the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record. *Id.* We evaluate the propriety of a summary judgment by employing the same standards and by using the same materials as were employed and used by the lower court. *Scherer Constr., LLC v. Hedquist Constr., Inc.*, 2001 WY 23, ¶ 15, 18 P.3d 645, ¶ 15 (Wyo.2001). We do not accord any deference to the district court's decisions on issues of law. *Id.*

*Trabing v. Kinko's, Inc.*, 2002 WY 171, ¶ 8, 57 P.3d 1248, 1252 (Wyo.2002).

 [¶ 8] When reviewing findings of fact and conclusions of law after a bench trial, we apply the following standard of review:

"The factual findings of a judge are subject to a broader scope of review than a jury verdict, and the appellate court may examine all of the properly admissible evidence in the record." *R.C.R., Inc. v. Rainbow Canyon, Inc.*, 978 P.2d 581, 586 (Wyo. 1999) (citing *Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 538 (Wyo.1993)). The findings of fact made by the district court will not be set aside unless clearly erroneous. *Hopper*, 861 P.2d at 538. The district court's conclusions of law are not binding on the reviewing court and are reviewed *de novo.*

*Baker v. Pike*, 2002 WY 34, ¶ 9, 41 P.3d 537, 541 (Wyo.2002).

## DISCUSSION

*Legal classification of the Maxsons' interest in the Appellants' lands*

[¶ 9] We must first determine whether the district court erred in construing the Maxsons' interest in the Appellants' lands as a profit. The issue is one of law and comes before us on a grant of summary judgment in favor of the Maxsons; therefore, our review is *de novo. See Smith v. Nugget Exploration*, 857 P.2d 320, 323 (Wyo.1993). We find that the district court properly applied the law and agree that a profit was created.

Creek no longer owns any land in sections 22 or 27 and, therefore, it is no longer involved in this

case.

[¶ 10] All parties agree that whatever interest the Maxsons have was created by McKinley's warranty deeds to the original purchasers of the Maxsons' land. Our rules of construction for deeds are well known:

> We interpret a warranty deed like a contract "from specific language of the deed," and "begin by looking at the instrument itself." *Bixler* [*v. Oro Mgmt., L.L.C.,* 2004 WY 29], ¶ 16[, 86 P.3d 843, 849 (Wyo. 2004)]. We must first examine the terms of the deed and give them their plain and ordinary meaning. Plain meaning is that "meaning which [the] language would convey to reasonable persons at the time and place of its use." *Id.,* ¶ 14. When the provisions in the contract are clear and unambiguous, the court looks only to the "four corners" of the document in arriving at the intent of the parties. Determining the parties' intent is our prime focus in interpreting or construing a contract. *Boley v. Greenough,* 2001 WY 47, ¶ 11, 22 P.3d 854, ¶ 11 (Wyo.2001).

*Gilstrap v. June Eisele Warren Trust,* 2005 WY 21, ¶ 12, 106 P.3d 858, 862 (Wyo.2005).

[¶ 11] Before we analyze the language of the original warranty deeds, however, we must review certain non-possessory privileges and interests in land.

> A license is a privilege to do certain acts of a temporary character on the land of another which is revocable at the will of a licensor unless a definite time has been specified, or unless it is coupled with an interest. *Coumas v. Transcontinental Garage,* 68 Wyo. 99, 230 P.2d 748, 758 (1951). A license does not give any interest in the land, but means that one who possesses a license is not a trespasser. *Anthony Wilkinson Live Stock Co. v. McIlquam,* 14 Wyo. 209, 226–27, 83 P. 364, 369 (1905); *Metcalf v. Hart,* 3 Wyo. 513, 527, 27 P. 900, 905 (1891). A license may be created by parol, a writing, or can be implied from the acts of the parties, from their relations, and from usage and custom. *Kendrick v. Healy,* 27 Wyo. 123, 148, 192 P. 601, 610 (1920).

*Sammons v. American Auto. Ass'n,* 912 P.2d 1103, 1105 (Wyo.1996). Licenses are distinguishable from servitudes, which are interests in land:

> (1) A servitude is a legal device that creates a right or an obligation that runs with land or an interest in land.
>
> (a) Running with the land means that the right or obligation passes automatically to successive owners or occupiers of the land or the interest in land with which the right or obligation runs.
>
> (b) A right that runs with land is called a "benefit" and the interest in land with which it runs may be called the "benefited" or "dominant" estate.
>
> (c) An obligation that runs with land is called a "burden" and the interest in land with which it runs may be called the "burdened" or "servient" estate.

Restatement (Third) of Prop.: Servitudes § 1.1(1) (2000 & Cum.Supp.2006).

[¶ 12] A "servitude" is a general category that includes a variety of non-possessory interests in land, including easements and profits. *Id.* § 1.1(2). "An easement is defined as 'an interest in land which entitles the easement holder to a limited use or enjoyment over another person's property.'" *Hasvold v. Park County Sch. Dist. No. 6,* 2002 WY 65, ¶ 13, 45 P.3d 635, 638 (Wyo. 2002) (quoting *Mueller v. Hoblyn,* 887 P.2d 500, 504 (Wyo.1994)). Profits have been referred to as "easements 'plus.'" Restatement (Third) of Prop.: Servitudes § 1.2 cmt. e. The Restatement explains that "[p]rofits are easements (rights to enter and use land in the possession of another) plus the right to remove something from the land." *Id.* Similarly, 28A C.J.S. *Easements* § 9 (1996) notes that "[t]he [profit] right is in the nature of an easement, and it is often called an easement; but it is more than an easement. It is an interest or an estate in the land itself as distinguished from a mere personal obligation of the owner of realty." *Cf.* 25 Am. Jur.2d *Easements and Licenses* § 3 (2004) ("[A] profit a prendre is a liberty in one person to enter another's soil and take from it the fruits not yet carried away. A profit a prendre is therefore distinguishable from an easement, since one of the features of an easement is the absence of all right to partic-

ipate in the profits of the soil charged with it.") In agreement with these general rules, we have said that a "profit a prendre is . . . a right to take a certain thing or things from the land of another. If, accordingly, the right to take does not exist, the right cannot, at least strictly, be called a profit a prendre." *Denver Joint Stock Land Bank of Denver v. Dixon,* 57 Wyo. 523, 122 P.2d 842, 847 (1942).

[¶ 13] Profits and easements may be appurtenant to a dominant estate or held in gross. 25 Am.Jur.2d *Easements and Licenses* §§ 3, 8, 9; 28A C.J.S. *Easements* §§ 9–11. An "appurtenant" non-possessory interest in land "means that the rights or obligations of a servitude are tied to ownership or occupancy of a particular unit or parcel of land." Restatement (Third) of Prop.: Servitudes § 1.5(1). An interest is "in gross," however, when the right "is not tied to ownership or occupancy of a particular unit or parcel of land." *Id.* § 1.5(2).

[¶ 14] Finally, we note that "[t]he principle difference between a servitude and a license is that a license is revocable at will. An easement or profit, by contrast, is normally irrevocable. Easements and profits can be revoked only if the right to revoke is expressly reserved and properly exercised." *Id.* § 2.2 cmt. h.

[¶ 15] The Maxsons currently own two parcels that were conveyed to their predecessors in interest by McKinley in 1957 and 1958, respectively. The relevant language in those warranty deeds is nearly identical:

Reserving unto Grantors all Ski and road rights of way and subject to the following Restrictive and Protective Covenants for all land now owned or hereafter acquired by Grantors in Section[s] 22 and 27, Township 18 North, Range 78 West of the 6th P.M., Wyoming:

1. There shall be no pollution of the East Fork of Dutton Creek or any of its tributaries;

2. Grazing rights are limited to land owned by grantees herein or hereafter acquired by grantees herein.

3. Each purchaser [sic] from grantor herein to lands in Section[s] 22 and 27 in said Township shall have equal water rights and water rights of way to the said East Fork of Dutton Creek and its tributaries in said areas;

4. All building sites and all buildings that shall be built by grantees upon the above described lands shall be maintained in a neat and orderly manner;

5. *Hunting and fishing privileges are extended to all lands now owned by grantor, or hereafter acquired by grantor in said Sections 22 and 27,* but said privileges must not be commercialized by grantees herein;

6. These covenants are to run with the land and shall be binding on grantors and grantees and all persons claiming under them.

7. If the parties hereto, or any of them or their heirs or assigns shall violate or attempt ·to violate any of the covenants herein, it shall be lawful for any other person or persons owning any real property situated in W½W½ of Section 27 and W½ W¼ Section 22 in said Township to prosecute any proceedings at law or in equity against the person or persons violating or attempting to violate any such covenants and either to prevent him or them from so doing or to recover damages or the dues for such violation.[2]

(Emphasis added.)

[¶ 16] The Appellants argue that the hunting and fishing language in paragraph 5, above, created a revocable license between McKinley and the original grantees. The Maxsons argue that the district court correctly construed the language and McKinley created a profit. Though the parties disagree about the meaning of the language, neither party argues that the deed is ambiguous. Mere disagreement as to the meaning of language in a deed does not necessarily mean that the deed is ambiguous. *Newman*

---

**2.** Some language in the 1958 conveyance differed in minor respects, but for purposes of this

appeal, such disparities are of no consequence.

*v. Rag Wyo. Land Co.*, 2002 WY 132, ¶ 11, 53 P.3d 540, 544 (Wyo.2002).

[¶ 17] In the similar context of determining whether an easement or license was created by a grant, we have said that when

> determining whether an easement or a license exists, the critical factor to consider is the parties' intent, identified by the manner in which the right was created, the nature of the right created, the duration of the right, the amount of consideration given for the right, and whether there is a reservation of power to revoke the right.

*Baker*, ¶ 20, 41 P.3d at 543. *See also Markstein v. Countryside I, L.L.C.*, 2003 WY 122, ¶ 33, 77 P.3d 389, 399–400 (applying the *Baker* factors to a grant of fishing rights).

[¶ 18] In the instant case, we note that (1) the hunting and fishing "privileges" were created in a warranty deed for property in the Woodedge area; (2) the grant created a legally enforceable right to enter and take wildlife and fish from the land of the grantor; (3) no time was specified for the "privileges" to continue or at which they would automatically cease; (4) consideration was paid for the warranty deed, including all items listed as "Restrictive and Protective Covenants"; and (5) the only implied basis for revoking the "privileges" was if they were "commercialized." We are further cognizant of the following characteristics of the language in the warranty deed:

- Though not dispositive, the "privileges" are designated as "Restrictive and Protective Covenants." *See Markstein*, ¶ 32, 77 P.3d at 399 ("The label that the parties give the right, however, does not dictate its legal effect.");

- The "covenants" run with the land— i.e., they are appurtenant—and are binding on persons within the grantor's and grantee's line of title; and

- Paragraph 7 clearly contemplates that the heirs and assigns of the parties to the warranty deed could exercise and enforce the covenants.

Based on the language in the warranty deeds, it seems clear that McKinley created in the original grantees a right to enter and take game and fish, which right was appurtenant to the land and irrevocable unless the grantees or their heirs or assigns commercialized the right.[3]

[¶ 19] The Appellants, however, argue that the warranty deed did not contain grant language sufficient to create an interest in the land and also that, if an interest was created, it cannot properly be considered a profit. This argument is not persuasive. The Appellants focus on the phrase "privileges are extended" and argue that these are not "apt" words granting a profit to hunt and fish on the McKinley land. They correctly point out that the ultimate goal in determining whether a grant of an interest in land was made is to determine the intent of the parties to the deed. With the foregoing discussion in mind, we see no other intent than to grant a profit in the lands retained by McKinley. When read as a whole, the "covenants" in the warranty deeds—including the "privileges" to hunt and fish—evidence an intent to create a right in the grantees that was to run with the land, pass to the heirs and assigns of the grantees, and was irrevocable unless commercialized. We are similarly not persuaded that the use of the word "privileges" to describe the grant indicates an intent to create a revocable license. 35A Am.Jur.2d *Fish, Game, and Wildlife Conservation* § 8 (2001) notes that a right granted to hunt and fish on the land of another, while a property right, is properly considered a "privilege" because the ability to take game and fish is actually granted by the state. *See also Barton v. Gammell*, 143 Ga.App. 291, 293–94, 238 S.E.2d 445, 447 (1977) (grant of lake "privileges" constituted an easement, not a mere license); *Council v. Sanderlin*, 183 N.C. 253, 111 S.E. 365, 367 (1922) ("[a] deed for shooting privileges on land is a grant of a profit a prendre"); and 35A Am. Jur.2d *Fish, Game, and Wildlife Conservation* § 27 ("where a grantor has reserved the hunting privileges ..."; "a qualified right to hunt which is subject to the fee of hunting

---

3. There is no evidence in the record—and the Appellants have never alleged—that the Maxsons or anyone in their chain of title has attempted to commercialize hunting or fishing on the lands at issue in this appeal.

privileges reserved ...". We, therefore, hold that the use of the term "privileges" in the grant is sufficient to convey a profit in the land.

[¶ 20] The Appellants' final argument against categorizing the grant in the McKinley deeds as a profit is that, if an interest was created, it is not properly labeled a profit and we should instead recognize the right as an easement. The Appellants rely on Jon W. Bruce & James W. Ely, Jr., *The Law of Easements and Licenses in Land* (rev. ed. 2001 & Supp.2006) and Herman H. Hahner, *An Analysis of Profits a Prendre*, 25 Or. L.Rev. 217 (1946), for the proposition that game and fish are not "profits" of the soil—i.e., they belong to the State, not the private landowner—and, therefore, a profit was not created. At most, the Appellants argue, the McKinley deeds created an easement that, for public policy reasons, should be construed as an easement in gross. We find this argument to be without merit. First, a large majority of courts and secondary sources treat hunting and fishing rights in the land of another as profits. *See* 25 Am.Jur.2d *Easements and Licenses* § 3; 28A C.J.S. *Easements* § 9; L.S. Tellier, Annotation, *Right Created by Private Grant or Reservation to Hunt or Fish on Another's Land*, 49 A.L.R.2d 1395 (1956) and citations therein. The fact that game and fish do not grow from the soil of land and are considered the property of the State and not of the servient estate owner does not persuade us to abandon a long-established and widely-recognized rule of property law. Second, even if we were to decide that a profit cannot be created for hunting and fishing rights as a matter of law, the warranty deeds in the instant case clearly intended that the rights "run with the land" and were, therefore, appurtenant and automatically pass to subsequent grantees of the property.

[¶ 21] Because the language in the McKinley deeds clearly evidenced an intent to create an irrevocable, appurtenant profit to hunt and fish on the lands retained by McKinley, the district court properly granted summary judgment on this issue in favor of the Maxsons (the successors in interest to the grantees of the McKinley deeds). We find no indication from the four corners of the warranty deeds that the parties to those conveyances intended to create a revocable license or an easement in gross.

### Abandonment

[¶ 22] The Appellants claim that, even if a profit was created, such profit was abandoned prior to the Maxsons' ownership of the dominant estate. "The question of abandonment is one of fact, depending upon intention and conduct." *Boatman v. Andre*, 44 Wyo. 352, 12 P.2d 370, 374 (1932). As a question of fact, we review the district court's determination that the profit was not abandoned under the "clearly erroneous" standard of review.

[¶ 23] The Appellants first claim that the profit was abandoned along with the larger development scheme to build a lodge, a ski area, and other improvements on the land retained by McKinley. At trial, the Appellants presented the testimony of witnesses who described their understanding of the general development scheme and further testified that such scheme had never been implemented. They also refer us to two "Agreements" introduced at trial that recite the terms of the development scheme. The Appellants' argument, as we understand it, is that (1) the profit was merely one right in a more general development scheme; (2) under the development scheme, McKinley was obligated to build certain improvements on the lands retained by him and subject to the profit; (3) such improvements were not built; therefore, (4) the scheme was abandoned and all rights thereunder were extinguished by abandonment.

[¶ 24] The district court determined that "although the general plan or scheme of the recreation community may have been abandoned, such is insufficient to allow for a *per se* abandonment of every covenant." The district court's findings are not clearly erroneous.

[¶ 25] The agreements relied upon by the Appellants were executed in 1955 between McKinley and third parties not within the Maxsons' line of title. Those agreements were specifically incorporated into the war-

ranty deeds in their respective transactions. In contrast, the Maxsons have never argued—and we have been presented with no direct evidence—that their land was part of the general development scheme. Further, there is no evidence that the McKinley conveyances to the Maxsons' predecessors were subject to the development scheme, but those conveyances did expressly grant rights to hunt and fish on the lands retained by McKinley.[4] Therefore, the district court's determination that the profit to hunt and fish was not extinguished by McKinley's conduct—even if the general development scheme was abandoned—is not clearly erroneous and must be affirmed.[5]

[¶ 26] The Appellants next argue that, even if the profit has not been totally extinguished by abandonment as discussed above, then it was abandoned as to the Kuhns' land in section 27 by the Woodedge owners in the years subsequent to the conveyances from McKinley. According to the Appellants:

The privilege to hunt and fish on grantor's lands has only been exercised by members of the Woodedge community within Section 22, and they have been cut off from Section 27 since at least the mid–1960s. In a footnote, the district court states that the evidence reflected that hunters ignored the 'off limits' nature of the W½ W½ of Section 27 and continued to hunt therein. The record supports the statement that individuals hunted within Appellants' lands in Section 27. However, there was no evidence presented that these individuals were members of the Woodedge community.

[¶ 27] The district court addressed this issue in its decision letter as follows:

Defendants assert that, particularly as to the W½ W½ of Section 27, there has been no demonstration that the Maxsons or any other Woodedge landowner ever hunted in the vicinity. While, at times, the Section 27 lands certainly were deemed "off limits" to hunting based on certain evidence, other evidence demonstrated that hunters, in fact, ignored the methods utilized to restrict hunting in the area and continued to hunt therein.

The district court's findings of fact on this issue are not clearly erroneous.

[¶ 28] We agree with the district court's reliance on *First Nat'l Bank v. Konner*, 373 Mass. 463, 367 N.E.2d 1174, 1177 (1977), wherein it was stated that

it is clear that a profit a prendre, like an easement, can be abandoned. *Gerhard v. Stephens*, 68 Cal.2d 864, 882[, 69 Cal.Rptr. 612, 442 P.2d 692] (1968). Restatement of Property §§ 504, 450, special note (1944). 3 H. Tiffany, Real Property § 847 (3d ed.1939). In cases dealing with easements, we have held that the rights of a dominant owner will not be extinguished under the theory of abandonment unless there is a nonuser coupled with an intent to abandon. Nonuser alone, no matter how long continued, will not suffice. *Desotell v. Szczygiel*, 338 Mass. 153, 158–159[, 154 N.E.2d 698] (1958). It is also necessary to show "acts by the owner of the dominant estate conclusively and unequivocally manifesting either a present intent to relinquish the easement or a purpose inconsistent with its further existence. *Willets v. Langhaar*, 212 Mass. 573, 575[, 99 N.E. 466] [1912]." *Dubinsky v. Cama*, 261 Mass. 47, 57[, 158 N.E. 321, 324] (1927).

Further, the "servient estate owner must prove that the dominant estate owner intended to abandon the easement and such intention 'may be inferred only from strong and convincing evidence.'" *Hasvold*, ¶ 26, 45 P.3d at 641 (quoting *Mueller v. Hoblyn*, 887 P.2d 500, 506 (Wyo.1994)).

[¶ 29] In the instant appeal, we are not convinced that the district court erred in

4. We also note that the warranty deeds that incorporated the agreements contained language similar to the deeds at issue in this appeal within the deeds themselves. There is no indication from those deeds, however, that the hunting and fishing privileges were intrinsically bound to the general development scheme that was described in the separate agreements.

5. It is also true that McKinley, as the servient estate owner, had no power to abandon the rights of the dominant estate owners. *Hasvold*, ¶ 26, 45 P.3d at 641 (discussing abandonment of easements).

determining that the profit was not abandoned. The evidence relied on by the Appellants is as follows: (1) Mike McGill [6] attempted to block off the primary trail for entering section 27 from the Woodedge properties with a cable in the "middle to later" 1960s; (2) McGill had no knowledge of use of section 27 for hunting and fishing by the Woodedge owners after he barred their access; and (3) the Woodedge Property Owners Association had no record of any complaints from Woodedge owners regarding their lack of access to section 27 from the mid–1960s until 1994.

 [¶ 30] We must affirm the factual determination of the district court on this issue because the foregoing evidence fails to demonstrate that the district court clearly erred. As noted above, the Appellants bore the burden of proving intent to abandon the profit and an overt act of abandonment. At best, the Appellants' arguments tend to show nonuse of the profit for a period of time. Even that showing, however, is made in the negative—i.e., the argument only alleges that McGill was unaware of any exercise of the rights under the profit. Further, the Maxsons argue that (1) there was evidence that the cable across the path could easily be pushed to the ground and driven over; (2) Peter Kuhn installed a gate in 1994 to stop "the flow of traffic going south into Section 27"; (3) he also saw people hunting "in the Woodedge Subdivision"; and (4) John Maxson testified that it was common knowledge that Woodedge owners hunted and fished on sections 22 and 27.

[¶ 31] Given the lack of evidence of intent to abandon the profit in the 1960s, the abundant evidence of exercise of the profit rights in the 1990s, and the Appellants' own admission that hunting was being conducted but "there was no evidence presented that these individuals were members of the Woodedge community," we are unable to conclude that the district court clearly erred when it determined that the profit was not abandoned. We, therefore, affirm the district court's factual finding that the profit was not abandoned.

6. While not the owner of the land at issue, members of his family were successors in interest to McKinley and they owned the land subject to the

### Adverse possession

[¶ 32] The Appellants next argue that the profit in section 27 was extinguished by adverse possession, which adverse possession began when McGill placed a cable across the main ingress from Woodedge to section 27 during the 1960s. In conjunction with the cable, the Appellants emphasize that McGill notified the Woodedge community that hunting and fishing would no longer be allowed and he began patrolling section 27 and ejecting trespassers.

[¶ 33] In *Davis v. Chadwick*, 2002 WY 157, 55 P.3d 1267, 1270 (Wyo.2002) (quoting *Hillard v. Marshall*, 888 P.2d 1255, 1258 (Wyo.1995)), we said:

> In order to establish adverse possession, the claiming party must show actual, open, notorious, exclusive and continuous possession of another's property which is hostile and under claim of right or color of title. *Rutar Farms & Livestock, Inc. v. Fuss*, 651 P.2d 1129, 1132 (Wyo.1982); *City of Rock Springs v. Sturm*, 39 Wyo. 494, 502, 273 P. 908, 910 (1929). Possession must be for the statutory period, ten years. W.S. 1–3–103 (1988); *Connaghan v. Eighty–Eight Oil Co.*, 750 P.2d 1321, 1323 (Wyo. 1988); *Doenz v. Garber*, 665 P.2d 932, 935 (Wyo.1983).

While we have not dealt directly with the issue of extinguishment of a profit through adverse possession by a servient estate owner, we have discussed the analogous situation of extinguishment of an easement through adverse possession.

> The elements of adverse possession of land are very similar to the elements necessary to establish adverse possession of an easement. There is, however, an analytical distinction between the two categories of adverse possession. The owner of the servient estate claiming adverse possession of an easement already has the right to possess and use the land so long as that use is not inconsistent with the easement. *WYMO Fuels, Inc. v. Edwards*,

profit in the W½ W½ of section 27 at the time that the Appellants argue the profit was abandoned.

723 P.2d 1230, 1236 (Wyo.1986). Therefore, the owner of a servient estate must prove the use of the servient estate made during the period of adverse possession is sufficiently hostile and inconsistent with the use permitted by the easement.

> To extinguish an easement over (or use of) the servient tenements, the servient tenement owner must demonstrate a visible, notorious and continuous adverse and hostile use of said land which is inconsistent with the use made and rights held by the easement holder, not merely possession which is inconsistent with another's claim of title.

*Estojak v. Mazsa,* 522 Pa. 353, 562 A.2d 271, 275 (1989). *Accord Abbott v. Thompson,* 56 Or.App. 311, 641 P.2d 652, 655 (1982). Just as the creation of an easement by prescription is not favored in the law, the termination of an easement by adverse possession is not favored. *Shumway v. Tom Sanford, Inc.,* 637 P.2d 666, 670 (Wyo.1981).

*Mueller v. Hoblyn,* 887 P.2d 500, 507 (Wyo. 1994). *See also* Restatement (Third) of Prop.: Servitudes § 7.7 (2000) ("To the extent that a use of property violates a servitude burdening the property and the use is maintained adversely to a person entitled to enforce the servitude for the prescriptive period, that person's beneficial interest in the servitude is modified or extinguished").

▐ [¶ 34] Applying the foregoing rules, the district court in the instant case determined that the "Maxsons and Woodedge landowners have, in fact, made use of lands in Sections 22 and 27 despite Defendants' protests." Therefore, the use of the servient estate was not sufficiently hostile and inconsistent with the use of the profit to extinguish such profit through adverse possession.

[¶ 35] After a careful review of the record, we find that sufficient evidence supports the district court's findings and affirm its decision on this issue. The evidence at trial indicated that: (1) as noted above, the cable meant to block access to section 27 could easily be disregarded; (2) McGill testified that he allowed hunting on section 22 but that "trespassers" were "a nightmare" during hunting season each year on the other

lands owned by his family, which lands included the section 27 lands; (3) the defendants at trial did not produce any evidence that the Woodedge owners were actually prevented from exercising their rights under the profit—instead, evidence was presented that McGill was merely unaware of any hunting or fishing; and (4) McGill admitted that William Moore, a Woodedge owner, clearly indicated his intent to hunt on any of the land owned by McGill's family. It may have been possible for the district court to reach a different conclusion; however, our standard of review requires us to affirm the decision of the district court if it is not clearly erroneous. Based on the evidence in the record, the district court could properly find that the Woodedge owners and the Maxsons' predecessors in interest were still able to enjoy their rights under the profit and McGill's possession was not, therefore, sufficiently hostile and inconsistent to extinguish such profit through adverse possession.

### Use of motorized vehicles while exercising rights under profit

[¶ 36] Because the profit was not extinguished by adverse possession or abandonment, we must next ascertain whether the district court erred when it determined that the Maxsons could use motorized vehicles on the servient estates while exercising their rights under the profit. The Appellants argue that:

> In establishing the scope of the Appellees' hunting and fishing profit, it should be based on how fishing and hunting were practiced in the 1940s and 1950s in Wyoming as this is the pertinent vicinity and time of execution of the deeds in question. . . . Appellees should be limited to the scope of that intention, and the methods of that place and time period.

In its decision letter, the district court determined, however, that:

> Although motorized vehicle access may have been limited in the area at the time, the Court cannot conclude McKinley intended to limit hunting so as to exclude motorized vehicles. Rather, the use of a vehicle is "reasonably necessary and con-

venient" to the enjoyment of a hunting profit.

[¶ 37] In reaching its decision, the district court relied on *Isherwood v. Salene,* 61 Or. 572, 123 P. 49 (1912) and *Bland Lake Fishing & Hunting Club v. Fisher,* 311 S.W.2d 710 (Tex.App.1958). In *Isherwood,* 123 P. at 50, the Oregon court stated that the right to hunt ducks and fowl in that case was "limited to the usual and reasonable methods generally used in the vicinity at the time of the execution of the deed." *See also* 35A Am. Jur.2d *Fish, Game, and Wildlife Conservation* § 27 (2001) ("In the absence of anything to the contrary in a grant of hunting or fowling privileges, the right to hunt and fowl is limited to the usual and reasonable methods generally used in the vicinity at the time of the execution of the grant. . . ."). However, in *Bland Lake,* 311 S.W.2d at 715–16, while dealing with the scope of a profit, it was said that:

> Every easement carries with it the right of doing whatever is reasonably necessary for the full enjoyment of the easement itself. Extent of such incidental rights depends upon the purpose and extent of the grant itself. Such right is limited and must be exercised in such a reasonable manner as not injuriously to increase the burden upon the owner of the fee. Nothing passes by implication as incidental to a grant except what is reasonably necessary to its fair enjoyment. What is reasonably necessary for the full enjoyment of the easement will be determined by a construction of the language of the express grant, considered in the light of the surrounding circumstances. 28 C.J.S. *Easements* § 76, p. 754.

[¶ 38] While the preceding rules appear to be contradictory, we view them merely as aids to interpretation of the scope of the original grant. As we discussed extensively above, intent is the touchstone of deed interpretation. When creating the profit at issue in this appeal, McKinley was free to restrict the right to its usual methods at the time of the grant, but he was also free to allow exercise of the profit to adapt to changing technologies and practices. The district court determined that McKinley intended to make a broad grant of a profit that allowed

motorized vehicles to be used by the dominant estate owners while enjoying the profit. We agree.

[¶ 39] The language of the deeds clearly indicated an intent that the profit could be expanded prospectively. McKinley granted the profit not only in land currently owned by him, but also in any lands he may later acquire. While that language alone does not answer the instant question, it is probative as to the issue of whether we should narrowly or broadly construe McKinley's intent when the deeds were conveyed. The district court, in analyzing the profit, correctly weighed evidence outside of the warranty deeds when it determined that use of motorized vehicles was within the scope of the profit. That evidence indicated that Erskine Harton, a grantee of land from McKinley in section 27, used a four-wheel drive vehicle to access his land beginning in 1955 and, indeed, traveled to the land with McKinley in a vehicle on an established trail. The evidence also indicated that vehicle use in exercising the profit was prevalent enough in the decade after the right was created to prompt McGill to attempt to block access to section 27 by running a cable across the main access point. Under these circumstances, we will affirm the conclusion of the district court that reasonable motorized vehicle use is allowed in exercising the Maxsons' profit right to hunt on the servient estates in sections 22 and 27.

### Right to enter adjoining public lands

[¶ 40] The Appellants' final argument is that the district court erred when it held that:

> 11. Plaintiffs are prohibited from using the lands of the Defendants as a general access right, but are permitted to enjoy their hunting and fishing rights on the lands of the Defendants as outlined herein and adjacent lands which Plaintiffs have a lawful authority to enter. *This Court has no authority to prohibit Plaintiffs from lawfully crossing over into lands upon which they are lawfully permitted, including, but not limited to, lands owned by the United States Forest Service and the Bureau of Land Management.*

(Emphasis added.) The crux of the Appellants' argument is that the Maxsons, as well as other Woodedge owners, are enforcing their profit rights not to hunt and fish on the burdened land, but to use the land as a general access easement—specifically, they allege that the Woodedge owners wish to use their profit rights as an excuse conveniently to access Forest Service and Bureau of Land Management lands. The Maxsons acknowledge that they do not have a "general right of ingress and egress across the lands of Appellants," but maintain that they have a right to enter Forest Service and BLM lands during the course of rightfully enjoying their profit.

[¶ 41] Based on these arguments, it seems clear that both parties agree that the Maxsons may only enter the Appellants' land in section 27 [7] to exercise their rights under the profit; i.e., they may only enter to hunt and fish. Similarly, they agree that the Maxsons may not merely use the road over section 27 to reach and hunt upon public lands. The disagreement arises where the Maxsons, properly exercising their right to hunt on the Appellants' land, wish to cross from such land onto adjacent public lands where, the evidence established, they may also legally hunt.

[¶ 42] We will affirm the order of the district court on this issue. According to the terms of the grant, there is no requirement that the dominant estate owner enter or exit the servient estate in a certain location or manner. As discussed at length in the first issue on appeal, the holder of a profit has a right to (1) enter land in possession of another; (2) use that land in a specified manner—here, to hunt and fish; and (3) take certain things from the land—here, game and fish. The Maxsons are not required, under the grant, to enter and exit the Appellants' land at the same point, nor are they required to hunt exclusively on that land. The Maxsons may be on the Appellants' land while they are exercising their rights according to the profit. If, in the course of exercising their rights, they leave the Appellants' land, they have not violated the profit. Finally, we note that while all parties agree that the Maxsons may not merely travel from their parcels over the Appellants' property to public lands, it is also true that the Maxsons may not hunt on public lands and travel over the Appellants' property as the most direct route back to their parcels.

## CONCLUSION

[¶ 43] The district court properly concluded that the Maxsons hold a profit a prendre in certain lands of the Appellants and that the profit had not been subsequently extinguished through abandonment or adverse possession. Further, the district court did not err in defining the scope of the profit to include reasonable use of motorized vehicles, and to exclude a general access easement across the Appellants' lands. Affirmed.

7. While our analysis generally applies to all lands burdened by the Maxsons' profit, the Appellants' chief concern is with use of a road that connects the Maxsons' parcels with public lands over the northeast corner of the servient estate in section 27.