2009 WY 38

Elissa A. OMOHUNDRO, Trustee of the First Restatement of the Elissa A. Omohundro Revocable Trust Agreement dated April 8, 2005; William D. Omohundro, Trustee of the First Restatement of the William D. Omohundro Revocable Trust Agreement dated April 8, 2005; and the Mc Family of Companies, LLC, a Wyoming limited liability company, Appellants (Defendants),

v.

Timothy S. SULLIVAN and Karen L. Sullivan, husband and wife; William J. Novotny, Jr. and Marilyn J. Novotny, husband and wife; David J. Goehring and Lynda A. Goehring, husband and wife; Babette L. Grala, Trustee of the William L. Grala Family Trust dated October 19, 2004, created under the First Restated William L. Grala Trust dated September 26, 2001; and Babette L. Grala, Trustee of the First Restated Babette L. Grala Trust dated September 26, 2001, Appellees (Plaintiffs).

Timothy S. Sullivan and Karen L. Sullivan, husband and wife; William J. Novotny, Jr. and Marilyn J. Novotny, husband and wife; David J. Goehring and Lynda A. Goehring, husband and wife; Babette L. Grala, Trustee of the William L. Grala Family Trust dated October 19,

2004, created under the First Restated William L. Grala Trust dated September 26, 2001; and Babette L. Grala, Trustee of the First Restated Babette L. Grala Trust dated September 26, 2001, Appellants (Plaintiffs),

v.

Elissa A. Omohundro, Trustee of the First Restatement of the Elissa A. Omohundro Revocable Trust Agreement dated April 8, 2005; William D. Omohundro, Trustee of the First Restatement of the William D. Omohundro Revocable Trust Agreement dated April 8, 2005; and the Mc Family of Companies, LLC, a Wyoming limited liability company, Appellees (Defendants).

Nos. S–08–0027, S–08–0028.

Supreme Court of Wyoming.

March 13, 2009.

Rehearing Denied April 14, 2009.

Representing Appellants in Case No. S–08–0027: Kendal Hoopes, Yonkee & Toner, LLP, Sheridan, Wyoming; Anthony T. Wendtland, Wendtland & Wendtland, LLP, Sheridan, Wyoming. Argument by Messrs. Hoopes and Wendtland.

Representing Appellees in Case No. S–08–0027: Kim P. Cannon and Sasha Johnston, Davis & Cannon, LLP, Sheridan, Wyoming. Argument by Mr. Cannon.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

KITE, Justice.

[¶ 1] Appellants (hereinafter referred to as Omohundro Trusts) own interests in Tract 6 of the Twin Lakes subdivision near Buffalo, Wyoming, and Appellees (hereinafter referred to collectively as the Sullivan Group) own Tracts 1 through 4. The parties dispute whether, under the subdivision restrictive covenants, Omohundro Trusts were required to obtain consent from all of the landowners before they could take action which would allow the City of Buffalo (herein referred to as the City) to obtain the water rights appurtenant to the subdivision lands. The district court ruled, on summary judgment, that the restrictive covenants unambiguously required the approval of the owners of all of the tracts. We agree and, consequently, affirm.

## ISSUES

[¶ 2] Omohundro Trusts present this issue for our consideration in Case No. S–08–0027:

Can the covenants and restrictions contained in the *Covenants for Twin Lakes, Buffalo, Wyoming,* which document specifically states that the restrictive covenants were created for and imposed upon Tracts 1–5, be extended by implication to also restrict the use of Tract 6?

The Sullivan Group lists three issues in Case No. S–08–0027:

1. Is there any reason, as a matter of law, that the Exhibit B lands could not be burdened in favor of the Exhibit A lands for whose benefit the Covenants were imposed?

2. Is there any ambiguity in the language of Section 3.13 of the Covenants?

3. Does the plain language of Section 3.13 of the Covenants support the District Court's declaratory judgment that the consent and approval of all Landowners is necessary before the Developer can take any action, step or procedure to annex the Exhibit B lands to the City of Buffalo under terms which would allow the City to receive ownership and control of a portion of these territorial water rights?

In its cross-appeal in Case No. S–08–0028, the Sullivan Group states the following issue:

If the Supreme Court does not simply affirm the District Court's summary judgment based on the plain meaning of the Covenants, may the Court consider uncontroverted facts and contextual evidence concerning the water rights which were the subject of Section 3.13 of the Covenants in the course of its *de novo* review?

Omohundro Trusts restate the issue in Case No. S–08–0028 as:

Should this Court, in construing the Covenants, consider extrinsic evidence that contradicts the plain language of the document and is asserted for the purpose of enlarging and adding to the restrictive covenant at issue?

## FACTS

[¶ 3] In 1994, Gerald Kaufmann acquired a 209 acre ranch known as the Crain property and its appurtenant water rights. The City owned an easement across the Crain property for a water line, and the existing ranch house was supplied with City water. Mr. Kaufmann entered into a "Water Connector's Agreement" with the City in which the City agreed to provide six additional residential water taps to the property. The agreement also provided that, if the property were ever subdivided into more than seven parcels so that additional water taps were

requested, the City would have the option to acquire the water rights appurtenant to all of the property.

[¶ 4] After executing the Water Connector's Agreement, Mr. Kaufmann conveyed the property to Twin Lakes L.C. (Twin Lakes), a company in which he and William Omohundro were members. Twin Lakes subdivided the property into six lots. Tracts 1 through 4 were vacant lots, each a little larger than 35 acres. Tract 5 was approximately 11 acres and included the existing ranch house. Tract 6 was the largest, at just over 50 acres. Twin Lakes executed and filed the restrictive covenants now at issue, then sold the lots.

[¶ 5] Omohundro Trusts, the current owners of Tract 6, entered into an agreement in 2006 giving MC Family of Companies, LLC the option to purchase the property. They have plans for Tract 6 to be annexed into the City and subdivided into approximately 90 residential lots. The Sullivan Group includes the current owners of Tracts 1 through 4.[1] In a complaint for declaratory judgment, the Sullivan Group asserted that the restrictive covenants require the approval of the owners of Tracts 1 through 5 before Omohundro Trusts could proceed with the development and annexation plans on Tract 6 because, pursuant to the Water Connector's Agreement, such action would allow the City to acquire the water rights appurtenant to all of the property. The development plans have been put on hold pending the outcome of this litigation.

[¶ 6] The parties filed cross motions for summary judgment and each supported its motion with extrinsic evidence to aid the court in interpretation of the covenants. The district court ruled that it would not consider any extrinsic evidence, granted summary judgment in favor of the Sullivan Group and enjoined Omohundro Trusts from taking any action that would result in the transfer of the water rights to the City. It ruled that the restrictive covenants were unambiguous and that they obligated Omohundro Trusts to obtain approval from the other tract owners before annexing and developing Tract 6.

1. The owner of Tract 5 is not involved in this case.

Omohundro Trusts appealed the summary judgment and injunction in Case No. S–08–0027, and the Sullivan Group appealed the district court's refusal to consider the extrinsic evidence in interpreting the covenants in Case No. S–08–0028.

### STANDARD OF REVIEW

[¶ 7] Pursuant to W.R.C.P. 56, summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Metz Beverage Co. v. Wyo. Beverages, Inc.*, 2002 WY 21, ¶ 9, 39 P.3d 1051, 1055 (Wyo.2002). "A genuine issue of material fact exists when a disputed fact, if it were proven, would establish or refute an essential element of a cause of action or a defense that the parties have asserted." *Id.* We review a summary judgment decision using the same materials and following the same standards as the district court. *Mathisen v. Thunder Basin Coal Co., LLC*, 2007 WY 161, ¶ 9, 169 P.3d 61, 64 (Wyo.2007). Summary judgment involves a purely legal determination; consequently, we undertake *de novo* review of a trial court's summary judgment decision. *Glenn v. Union Pacific R.R. Co.*, 2008 WY 16, ¶ 6, 176 P.3d 640, 642 (Wyo.2008).

[¶ 8] Interpretation of covenants imposing restrictions or conditions on the use of land is a matter of law for the courts. *Goglio v. Star Valley Ranch Ass'n*, 2002 WY 94, ¶ 12, 48 P.3d 1072, 1076 (Wyo.2002). Interpretation of unambiguous covenants is, therefore, properly addressed in a motion for summary judgment. *Boley v. Greenough*, 2001 WY 47, ¶ 10, 22 P.3d 854, 857–58 (Wyo. 2001). On the other hand, if covenants are ambiguous, their interpretation generally raises genuine issues of material fact and summary judgment is precluded. *Jackson Hole Racquet Club Resort v. Teton Pines Ltd. Partnership*, 839 P.2d 951, 958 (Wyo. 1992).

### DISCUSSION

[¶ 9] Covenants are contractual in nature and are interpreted according to principles of contract law. *Goglio*, ¶ 18, 48

P.3d at 1079. A court's goal is to determine and effectuate the intention of the parties, especially the grantor or declarant. *Stevens v. Elk Run Homeowners' Ass'n, Inc.*, 2004 WY 63, ¶ 13, 90 P.3d 1162, 1166 (Wyo.2004). We first examine the language of the covenants and give the words their plain and ordinary meaning. *Seven Lakes Dev. Co., L.L.C. v. Maxson*, 2006 WY 136, ¶ 10, 144 P.3d 1239, 1245 (Wyo.2006). We consider the whole document and not just one clause or paragraph. *Stevens*, ¶ 13, 90 P.3d at 1166. A disagreement between the parties as to the meaning of covenants does not give rise to an ambiguity. *Hansen v. Little Bear Inn Co.*, 9 P.3d 960, 964 (Wyo.2000).

[¶ 10] In the document entitled "Covenants for Twin Lakes, Buffalo, Wyoming," Tracts 1 through 5 are referred to as "Exhibit 'A' lands," while Tract 6 is referred to as "Exhibit 'B' lands." Section 3.13 of the restrictive covenants is at the heart of this dispute:

> 3.13 *NO FURTHER SUBDIVISION.* Except as expressly provided herein, no lot may be split or subdivided for purposes of creating an additional home site except upon the written consent of 100% of all lot owners within the development as well as the consent of the owners of those lands adjoining the development, said lands being described on Exhibit "B" attached. Lot line adjustments between adjacent property owners shall be permitted with the consent of the Architectural Control Committee provided that such adjustments are made in accordance with all applicable statutory, governmental, and local rules and regulations and that any such adjustment shall not necessitate or require more than a total of five (5) water taps to be furnished to the entire development from the City of Buffalo . . . .
>
> Attached to these covenants as Exhibit "C" is an agreement between the City of Buffalo and Gerald M. Kaufmann (predecessor to the declarant) relative to the supplying of water taps from the water system of the City of Buffalo to lots within the development and those lands on Exhibit "B" attached hereto. The terms and provisions of said agreement are incorpo-

rated herein by reference and all owners shall be bound by its provisions. **Notwithstanding any other provision in this declaration, any action, step or procedure (including without limitation, the further subdivision of any lot within the development) or the omission of any act, step or procedure which would allow or entitle the City of Buffalo to take possession, ownership, and control of the irrigation water rights applicable to the development on Exhibit "B" lands as set forth in said attached agreement shall require the written consent and approval of 100% of all lot owners within the development as well as the record owner(s) of Exhibit "B" lands.**

(Emphasis in original.)

[¶ 11] The parties agree that the planned development and annexation of Tract 6 is an "action ... which would allow or entitle the City of Buffalo to take possession, ownership, and control of the irrigation water rights applicable to the development on Exhibit 'B' lands," or Tract 6. The Sullivan Group, relying on the bolded portion of Section 3.13 of the covenants, asserts that such action requires "the written consent and approval" of all owners of Exhibit "A" lands "as well as the record owner(s) of Exhibit 'B' lands." Omohundro Trusts, on the other hand, contend that when the entire document is considered, that provision of Section 3.13 should be interpreted to apply only to actions taken by owners of Exhibit "A" lands.

[¶ 12] The district court agreed with the Sullivan Group that approval of all owners was required. It ruled in relevant part:

The covenants are unambiguous. Section 3.13 of the covenants requires all landowners of lands described in Exhibit A to the covenants to consent to any action that results in a transfer of Exhibit B water rights. The proposed annexation would result in the transfer of these water rights from the current owner to the City of Buffalo. The [Sullivan Group landowners] own property described in Exhibit A, and they have not consented to the petition to annex. The actions taken by the [Omohundro Trusts] are contrary to the requirements of the covenants.

[¶ 13] As we stated earlier, we consider all parts of the covenants in interpreting a provision. The recitation paragraphs of the restrictive covenants begin:

A. Declarant is the owner of that certain property in the County of Johnson, State of Wyoming, which is more particularly described in Exhibit "A" attached hereto.

B. Declarant has established a general plan, set forth in this declaration, for the subdivision, improvement and development of the real property, and desires to secure the harmonious and uniform development of the real property in accordance with the said general plan.

NOW, THEREFORE, declarant hereby declares that the real property described on Exhibit "A" is, and shall be, held, conveyed, hypothecated and encumbered, subject to the following limitations, restrictions and covenants and all of which are declared and agreed to be for the purpose of enhancing, maintaining and protecting the value and attractiveness of the real property. Said limitations, restrictions and covenants shall run with the land, shall be binding on and inure to the benefit of all parties, and their successors and assigns.

The recitations explicitly provide that Tracts 1 through 5, described in "Exhibit A," are subject to the limitations, restrictions, and covenants. The covenants contain no provision subjecting Tract 6 to those limitations. Moreover, the "general plan" set forth in the declaration includes only Tracts 1 through 5.

[¶ 14] The definitions section of the restrictive covenants also focuses on Tracts 1 through 5. The terms "development" and "property" are defined to "mean and refer to all that certain real property which is described on Exhibit 'A.'" The term "lot" is defined as "any of the separate plots of land within the development." The term "owner" refers to the record owner of any lot.

■ [¶ 15] Omohundro Trusts argue that because the recitals at the beginning of the covenants mention only Exhibit "A" lands and the definitions of "development or property" and "lot" include only Exhibit "A"

lands, the covenants cannot, or were not intended to, impose any burden on Exhibit "B" lands. However, that interpretation is in direct conflict with the plain language of Section 3.13.

[¶ 16] When all of the language of Section 3.13 is examined, its meaning is clear. The first paragraph prohibits further subdivision of a lot without consent of all of the owners of lots and the owners of "those lands adjoining the development, said lands being described on Exhibit 'B' attached." No one questions that the provision creates a right in lands outside of those described in the recitation paragraphs of the covenants. That right is intended to run with the Exhibit "B" lands, just as all of the covenants are intended to run with the lands described in Exhibit "A." When the developer subdivided the entire property, it apparently deemed it important to restrict future subdivision of the Exhibit "A" lands by giving the owners of Exhibit "B" lands the right to approve the subdivision of its neighbors' property. Neither party contends that the developer lacked the power to create that right in these covenants even though Exhibit "B" lands are not included in the definition of "property" or "lot."

[¶ 17] The second paragraph of Section 3.13 contains equally clear language. First, it incorporates Exhibit "C," the Water Connector's Agreement with the City, into the covenants. Accordingly, that agreement must be considered in analyzing the "four corners" of the covenants. The Water Connector's Agreement applies to all of the lands in the "Crain [p]roperty" including both Exhibit "A" and Exhibit "B" lands; provides that if the Crain property is divided into more than seven (7) parcels resulting in requests for additional water taps, the City shall have the right to demand that the water rights "appurtenant to the Crain [p]roperty" be transferred to the City reserving to the Crain property only enough water to maintain the reservoirs; requires the developer to deposit a deed to those water rights into escrow for transfer when those contingencies occur; and requires those water rights to be beneficially used and maintained in good standing, and if they are not so used for a period of three years, gives the City the right to demand transfer of those rights.

[¶ 18] Under the terms of the Water Connector's Agreement, the owners of any portion of the Crain property have an equal interest in maintaining the Crain property water rights and in preventing any action that would cause those rights to be transferred to the City without the agreement of the owners of all of the property. In light of this agreement, it is understandable that the developer would create, and that potential buyers would want, covenants that would restrict the right of all owners, including both Exhibit "A" and Exhibit "B" owners, from taking any action that would give the City the right to acquire the water rights attributable to all of the property. Apparently, Omohundro Trusts have since negotiated a revised agreement with the City that would result in only the water right appurtenant to Exhibit "B" lands being transferred to the City upon subdivision of that property. However, the parties' intent at the time the covenants were created is the relevant question and, under the original terms of the Water Connector's Agreement, subdivision of Exhibit "B" lands would have resulted in the City being entitled to demand transfer of the entire Crain property water rights.

[¶ 19] Twin Lakes owned all of the lands at the time the covenants were executed. The legal description of Exhibit "B" lands is attached to the covenants. Omohundro Trusts do not cite any authority that would prohibit a declarant from creating different benefits and burdens on separate parcels of land described in the covenants. While the remainder of the covenants, as provided by the recitals and the definitions, apply only to Exhibit "A" lands, the language of Section 3.13 creates a limitation on any actions related to water rights on Exhibit "B" lands. No legal reason has been identified which would prohibit the owner of all of the lands from creating such a restriction.

[¶ 20] Omohundro Trusts suggest that the district court read language into Section 3.13 that does not exist when it ruled the restrictive covenants unambiguously required the consent of all landowners to its subdivision plans. They argue the interpretation

urged by the Sullivan Group and accepted by the district court results in adding "by the owner of the Exhibit 'B' lands" to modify the action requiring consent of all owners. However, no such insertion of language is necessary because the language chosen by the declarant was all-inclusive. In fact, Omohundro Trusts' interpretation is one that requires the court to insert language where it does not exist. They want this Court to conclude the covenants mean only an action "by the owners of Exhibit 'A' lands" requires the consent of all. Section 3.13 does not contain that limitation. Instead, it expressly applies to "any action," and is even preceded by the explicit phase, in bold-faced type, **"Notwithstanding any other provision in this declaration."** By its language, that caveat includes the recitation paragraphs that Omohundro Trusts claim should be interpreted as applying the restrictions in the covenants only to Exhibit "A" lands. Therefore, it appears the declarant explicitly chose very broad language in Section 3.13 to insure that the rights of the future owners of all of the lands in the Crain property were equally protected from the possibility that their water rights could be ceded to the City because of the actions of one of their neighbors.

[¶ 21] Before the district court, and in their appellate briefs, Omohundro Trusts contend the language of the covenants is unambiguous and nothing beyond the documents themselves should be considered. However, they then claim if this Court agrees with the district court's interpretation, a question of fact is somehow created, where none existed before. They claim that factual question is—what was the declarants' intent? We do not understand this circular reasoning. The question of law for this Court is the intent of the declarants as expressed by the unambiguous language in the document. While giving lip service to the concept that differing interpretations do not create questions of fact, Omohundro Trusts suggest that the parties' divergent opinions on the meaning of the covenants do just that.

[¶ 22] Although the parties offered evidence that they contended addressed the facts and circumstances surrounding execution of the covenants and asked the district court to consider that evidence in interpreting the covenants, the district court declined to do so and relied solely upon the language of the covenants. We have often stated the law on this issue and have done so recently in *Ecosystem Res. L.C. v. Broadbent Land & Res., L.L.C.,* 2007 WY 87, ¶ 10, 158 P.3d 685, 688 (Wyo.2007):

> [E]ven if a contract is unambiguous, we can examine evidence of the circumstances surrounding the execution of the deed to arrive at the parties' intent. *Hickman,* ¶¶ 6–11, 71 P.3d at 257–58. Relevant considerations may include the relationship of the parties, the subject matter of the contract, and the parties' purpose in making the contract. *Id.*

[¶ 23] Omohundro Trusts offered the affidavit of William Omohundro as support for its reading of the covenants in its summary judgment motion. As a member of Twin Lakes, Mr. Omohundro was one of the declarants to the covenants. He stated in his affidavit:

> As expressly stated throughout the Covenants, it was always the express intent of the Twin Lakes owners at all times to burden only Tract Nos. 1–5 with the Covenants. To the extent that the Covenants otherwise identify or reference the Tract No. 6[ ] lands, it was always the express intent of the Twin Lakes owners that they make such references only to provide additional protections for the Tract No. 6 parcel but not to burden the Tract No. 6 with the Covenants in any way or to obligate any owner of Tract No. 6 to any of the owners of Tract Nos. 1–5 under the Covenants in any way.

[¶ 24] If this averment was intended to be evidence of the declarants' subjective intent with regard to the effect of the covenants on Tract 6, it was not relevant, and, therefore, not admissible. A party's subjective intent is not relevant in contract interpretation cases because we use an objective approach to interpret contracts. *Roussalis v. Wyo. Med. Center, Inc.,* 4 P.3d 209, 231 (Wyo.2000). In *Shrum v. Zeltwanger,* 559 P.2d 1384, 1387 (Wyo.1977), in the context of an ambiguous contract, we stated:

There remains a genuine dispute as to the meaning of the contract term 'cows.' One says it means one thing, the other, another. It must be realized that all that is before the court is the subjective expressions of the plaintiffs' buyer agent and the defendants and those expressions are at opposite poles. One or the other may or may not represent what the parties really intended by their transaction. The intent of the parties can only be ascertained by an objective not subjective approach in contract situations. The subjective intent of the parties is ordinarily irrelevant. An objective test is applied. A party's intention will be held to be what a reasonable man in the position of the other party would conclude his manifestations to mean. Calamari & Perillo, Law of Contracts, HB, § 12, p. 14; 13 Williston on Contracts, 3d Ed. (Jaeger), § 1536, p. 11.

*See also,* Williston on Contracts, §§ 30:6, 31:4 (unambiguous contracts); 33:39 (ambiguous contracts) 4th Ed. (1999). Thus, evidence of the declarants' subjective intention is not relevant or admissible to interpret the contract, whether its language is ambiguous or not.

[¶ 25] Moreover, Omohundro Trusts' proffered evidence was just a rehash of their interpretation of the covenants. Omohundro Trusts offered no evidence of the declarants' objective intent other than the language of the covenants themselves. To the extent that the proposed extrinsic evidence was inconsistent with the express language of the document, it was not admissible. *See, e.g., Collins v. Finnell,* 2001 WY 74, ¶ 10, 29 P.3d 93, 98 (Wyo.2001); *Frost Constr. Co. v. Lobo, Inc.,* 951 P.2d 390, 394 (Wyo.1998). The relevant facts and circumstances surrounding the execution of the document can be gleaned from the covenants themselves and the documents attached thereto, including the Water Connector's Agreement with the City.[2]

[¶ 26] Affirmed.

BURKE, Justice, dissenting, with whom GOLDEN, Justice, joins.

[¶ 27] I respectfully dissent. I disagree with the majority's conclusion that the pertinent language in the restrictive covenants is unambiguous. Objectively, the language is ambiguous and subject to differing interpretations regarding the necessity of consent from all Exhibit "A" lot owners before subdivision of Exhibit "B" lands can occur. The interpretation of an ambiguous restrictive covenant raises genuine issues of material fact that preclude summary judgment. *Jackson Hole Racquet Club Resort,* 839 P.2d at 958. I would reverse the grant of summary judgment and remand for trial.

[¶ 28] In interpreting restrictive covenants, we endeavor to effectuate the intent of the declarant. *Stevens,* ¶ 13, 90 P.3d at 1166. We must consider the entire document, not a single sentence or paragraph in isolation. *Id.* The declaration of restrictive covenants at issue here is a twenty-seven page document. As the majority opinion recognizes, the entire document, with the possible exception of the single sentence at the heart of this dispute, applies only to Exhibit "A" lands. That sentence is:

> **Notwithstanding any other provision in this declaration, any action, step or procedure (including without limitation, the further subdivision of any lot within the development) or the omission of any act, step or procedure which would allow or entitle the City of Buffalo to take possession, ownership, and control of the irrigation water rights applicable to the development on Exhibit "B" lands as set forth in said attached agreement shall require the written consent and approval of 100% of all lot owners within the development as well as the record owner(s) of Exhibit "B" lands.**

(Emphasis in original.)

[¶ 29] This sentence does not specify whose actions are restricted or what lands are to be burdened by the restrictions. The

---

**2.** In their cross appeal, the Sullivan Group claims the district court erred by refusing to consider their proposed extrinsic evidence, which included evidence of the historical ownership, administration and use of the water rights appurtenant to the entire Crain property. Because we conclude that the district court properly interpreted the unambiguous language of the covenants, it is unnecessary for us to address the cross appeal.

Omohundro Trusts assert that this sentence is consistent with the rest of the document and is intended to restrict actions taken by the owners of Exhibit "A" lands, and to burden only Exhibit "A" lands. The Sullivan Group contends that the sentence is intended to restrict actions taken by the owners of both Exhibit "A" and Exhibit "B" lands, and to burden both properties. Because the sentence is silent about whose actions are restricted, and which properties are to be burdened, both interpretations are plausible. When language can reasonably be interpreted more than one way, it is ambiguous. *See, e.g., Treemont, Inc. v. Hawley,* 886 P.2d 589, 592 (Wyo.1994).

[¶ 30] The majority accepts the Sullivan Group's position. In reaching that result, the majority relies upon two propositions that are not warranted by the language of the document. First, in paragraph 18, the majority states that it is "understandable that the developer would create, and that potential buyers would want, covenants that would restrict the right of all owners, including both Exhibit 'A' and Exhibit 'B' owners, from taking any action that would give the City the right to acquire the water rights attributable to all of the property." While it may be understandable that potential buyers of Exhibit "A" lots would want the right to control development of Exhibit "B" property, there is no specific unambiguous language in the document reflecting the intent of the declarant/developer to convey that right to the Exhibit "A" owners. The observation by the majority may be a fair inference to be gleaned from the document, but it is, at most, an inference. Another, and conflicting, inference that could also be drawn from the document is that the declarant/developer did not intend to provide Exhibit "A" lot owners with veto power over the development of Exhibit "B" lands. Neither inference finds direct support in the language of the restrictive covenants. If an inference must be made about the developer's intent, it should, at this stage of the legal proceedings, be made in favor of the Omohundro Trusts, the party opposing summary judgment. *Mathisen,* ¶ 9, 169 P.3d at 64.

[¶ 31] Second, and perhaps more significantly, the majority concludes that the restrictions created by the disputed sentence are "all-inclusive," applying to both Exhibit "A" and Exhibit "B" lands. Again, I do not believe that interpretation is supported by the language of the entire document or the specific language of the sentence in dispute. The sentence is found in the second paragraph of Section 3.13, a section entitled "No Further Subdivision." The first paragraph of this section provides that Exhibit "A" lands cannot be further subdivided without the consent of all owners of Exhibit "A" and Exhibit "B" lands. It is undisputed that this restriction applies only to the further subdivision of Exhibit "A" lands. The paragraph does not mention subdivision of the Exhibit "B" lands, or give any indication of an intent to restrict further subdivision of the Exhibit "B" lands.

[¶ 32] The Omohundro Trusts assert that the sentence is intended to burden the Exhibit "A" property only. Their suggested interpretation is buttressed by the parenthetical phrase in the sentence immediately following the restricting language: "(including without limitation, the further subdivision of any lot within the development)." It is undisputed that the terms "lot" and "development" as used in the document refer only to Exhibit "A" lands. The limiting nature of the parenthetical phrase is difficult to reconcile with the "all-inclusive" interpretation adopted by the majority. The phrase is not addressed in the majority's analysis and raises a question: If the declarant/developer intended to be all-inclusive and restrict development of all property, why was the parenthetical example limited to further subdivision of Exhibit "A" property? It is abundantly clear that further subdivision of Exhibit "A" lands and its impact on water rights was considered and addressed in the document. There is no corresponding explicit unambiguous language in the document in general, or in Section 3.13 in particular, evidencing an intent to restrict further subdivision of Exhibit "B" lands.

[¶ 33] In the final analysis, I am convinced that there is more than one objective-

ly reasonable interpretation of the disputed sentence. "The only way to shake out what the parties intended or did not intend is by the adversary process of a trial." *Shrum,* 559 P.2d at 1387. Accordingly, I would reverse the grant of summary judgment and remand the case to allow the district court to resolve the ambiguity at trial.